1  Stephen C. Ruehmann, Esq. (167533)
2  **RUEHMANN LAW FIRM, P.C.**
   9580 Oak Avenue Parkway, Suite 15
3  Folsom, CA 95630
   Tel (916) 988-8001
4  Fax (916) 988-8002

5  Attorneys for Plaintiffs,
6  JOHN H. GIORDANO and GEORGANA G. GIORDANO

7

8  ## UNITED STATES DISTRICT COURT
   ## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION
9

10

11 JOHN H. GIORDANO and GEORGANA ) Case No.: CV10-4661-JF (PVT)
   G. GIORDANO,                   )
12                                )  **PLAINTIFFS' FIRST AMENDED**
                                  )  **COMPLAINT:**
13           Plaintiffs,          )
   vs.                            )
14                                )  1.  **Financial Elder Abuse**
   WACHOVIA MORTGAGE, FSB;        )  2.  **Unfair Business Practices (Violation of Bus.**
15 WELLS FARGO, N.A; ETS SERVICES, )      **& Prof. Code §17200, et seq.)**
   LLC and DOES 1 to 100, inclusive, )
16                                )
17           Defendants.          )  **DEMAND FOR JURY TRIAL**
                                  )
18 _____ )

19

20      **COMES NOW** Plaintiffs, JOHN H. GIORDANO and GEORGANA G. GIORDANO

21 ("Plaintiffs") who avers the following:

22                              **PARTIES**

23      1.      At all times mentioned herein, Plaintiffs were adults and residents of Santa Clara

24 County, California.  Plaintiffs are the owners of real property located at 1136 Speciale Way, San

25 Jose, California 95125. (the "Subject Property")  The Subject Property is a single family

26 residence where Plaintiffs currently reside.

27      2.      At all times herein, World Savings Bank, FSB ("WSB") was a federal savings

28 bank, doing business in Santa Clara County, California.  WSB is identified as the Lender of the

Deed of Trust.  (A true and correct copy of the Deed of Trust is attached hereto as **Exhibit 1** and incorporated herein by this reference.)  In December 2007, WSB changed its name to WACHOVIA MORTGAGE, FSB ("WACHOVIA").  Accordingly, all allegations against WSB are read to include WACHOVIA.

3.      At all times herein, WACHOVIA was the servicer of Plaintiffs' loan.  Plaintiffs are informed, believe and allege that on November 1, 2009, WACHOVIA merged with Defendant WELLS FARGO BANK, N.A. ("WELLS") and is now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A.  Plaintiffs are informed, believe and allege that WELLS is liable for the actions of WACHOVIA, including those alleged herein.  Accordingly, all allegations against WACHOVIA are read to include WELLS.

4.      Plaintiffs are informed, believe and allege that ETS SERVICES, LLC ("ETS") is a Delaware Limited Liability Corporation doing business in Santa Clara County, California.  ETS is foreclosing trustee and an agent and employee of WACHOVIA.

5.      Plaintiffs remain ignorant of the true name and capacity of each Defendant sued herein as DOES 1 through 100, inclusive and therefore sues those Defendants by such fictitious names.  Plaintiffs will amend this complaint to reflect the true names and capacities of those Defendants when they have been ascertained.  Plaintiffs are informed, believe and allege that each Defendant sued herein in relation to the property they claim an interest in was the agent and/or employee of each of the remaining Defendants thereof and at all times was acting within the purpose and scope of such agency and/or employment.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this complaint under 28 U.S.C. §§ 1331 and 1337

7.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as the events transpired in Santa Clara County, California, and the Subject Property is located in the San Jose, California, County of Santa Clara.

**BACKGROUND FACTS**

9.      In December of 2005, Plaintiffs entered into a contract to refinance the Subject Property using WSB as the lender.  At the time that Plaintiff, John H. Giordano was 78 years old and Plaintiff, Georgana G. Giordano was 60 years old.  WSB represented to Plaintiffs that based on their credit score and the current market conditions that they had qualified and had obtained a loan with very favorable terms.  Specifically, WSB told Plaintiffs they had obtained a 30-year fully-amortized adjustable rate mortgage ("ARM") with an initial annual interest rate of 6.710%.

10.      Plaintiffs believed the representations of WSB.  Based upon the representations of WSB that Plaintiffs decided to refinance the Subject Property.  Unfortunately, those representations were false and the true terms of the loan agreement are significantly different than the terms represented by WSB.  The true terms are as follows: WSB gave Plaintiffs a 30-year "pick-a-payment" ARM with a 2-month "teaser" interest rate at 6.710%.  Thereafter the interest rate is adjustable based on the GDW Average Deposit Account Rate (COSI) plus 3.500%, with a cap at 11.950%.  (A true and correct copy of the Note is attached hereto as **Exhibit 2** and incorporated herein by this reference.)  Plaintiffs' loan included a negative amortization feature and a predatory and illegal prepayment penalty provision.  (See **Exhibit 2**.)

11.      Plaintiffs believed that they had obtained a 30-year fully-amortized ARM with an initial annual interest rate at 6.710%.  These are the terms Plaintiffs agreed to and believed were embodied in the loan agreement, as represented by WSB.  Plaintiffs were unaware that the loan included a negative amortization feature and an illegal and predatory prepayment penalty.  Plaintiffs were also unaware that the 6.710% disclosed interest rate would adjust before Plaintiffs' made their first payment; this disclosed interest rate was never actually applied to Plaintiffs' loan.  (See **Exhibit 2**.)  The disclosure of an initial interest rate at 6.710% was misleading at best and fraudulent at worst.

12.      These features were not explained to Plaintiffs, who relied on WSB – their agent – to explain the voluminous packet of loan documents and terms.  Instead, a huge stack of loans documents were produced and Plaintiffs were instructed to immediately sign each document.  Plaintiffs, being elderly and unsophisticated borrowers, relied on WSB – their agent – to explain

the voluminous packet of loan documents. However, WSB failed to do so. Plaintiffs allege and believe that due to their advanced age and apparent naivety as to real estate and borrower qualifications, WSB recognized Plaintiffs' weaknesses and preyed upon the opportunity to benefit from Plaintiffs' age and lack of knowledge.

13.    Plaintiffs are informed, believe and allege that WSB had a well established pattern and practice of deceiving potential borrowers solely to generate a large volume of loans in order to maximize profits. For example, WSB collected unearned kickbacks and "junk" fees in excess of $11,000, representing 1.6% of the subject loan. Because every percentage point increases the offered interest rate by 0.5%, Plaintiffs initial interest rate was increased by 0.75%. If WSB had not collected these fees, Plaintiffs initial interest rate would have been 5.96%

14.    Plaintiffs are informed and allege that in December 2007, WSB changed its name to WACHOVIA. Accordingly, all allegations against WSB are read to include WACHOVIA.

15.    In 2009, Plaintiffs began to experience severe financial problems due in part to the increasing interest rate and mortgage payments and began to struggle to make their monthly mortgage payments. It was not until this point in time that Plaintiffs began to suspect that the true terms and conditions of the loan agreement were significantly different than the terms previously represented by WSB.

16.    On August 11, 2009, a Notice of Default ("NOD") was recorded by ETS, acting as the agent of Beneficiary. (A true and correct copy of the NOD is attached hereto as **Exhibit 3** and incorporated herein by this reference.) Civil Code § 2923.5(a) **requires** a mortgagee, beneficiary or authorized, to the borrower in person or by telephone in order to the borrower's financial situation and explore options for the borrower to avoid foreclosure. A mortgagee, trustee, beneficiary or authorized agent may **not** file a NOD **until 30 days after** satisfying the due diligence requirements as described in Civil Code § 2923.5(g). [Emphasis Added.]

17.    In this case, there is **no** declaration of compliance attached to the NOD. Rather, it is based on unsworn hearsay recitations that "the beneficiary or its authorized agent has declared that they have complied with Civil Code §2923.5." In addition, the NOD fails to when, if ever, Defendants contacted to Plaintiffs to assess their financial situation and explore alternatives to

help them avoid foreclosure.  (See **Exhibit 3**.)

18.     Plaintiffs are informed and allege that on November 1, 2009, WACHOVIA merged with WELLS and is now known as Wachovia Mortgage, a division of Wells Fargo Bank, N.A. Accordingly, all allegations against WACHOVIA are read to include WELLS.

19.     On November 12, 2009 a Substitution of Trustee ("SOT") was recorded that replaced Golden West Savings Association Service Co., the original Trustee, with ETS. (A true and correct copy of the SOT is attached hereto as **Exhibit 4** and incorporated herein by this reference.)  On that same day, a Notice of Trustee's Sale ("NOS") was recorded by ETS, the foreclosing Trustee. (A true and correct copy of the NOS is attached hereto as **Exhibit 5** and incorporated herein by this reference.)

20.     After receiving a copy of the NOS, Plaintiffs contacted WACHOVIA to ask about options available for assistance with their mortgage payment or if they could receive a loan modification. Without assessing their financial situation or exploring other alternatives to foreclosure, WACHOVIA simply told Plaintiffs to submit a loan modification application and documents verifying their current financial circumstances.

21.     Plaintiffs promptly complied with WACHOVIA's request by submitting a loan modification application and documents verifying their current financial circumstances. Plaintiffs contacted WACHOVIA each and every month thereafter to check on the status of their loan modification application. Each time Plaintiffs contacted WACHOVIA, they were told their application was still under review.  Accordingly, Plaintiffs had every reason to believe and expect that their application for a loan modification would be approved and was forthcoming.

22.     After hearing nothing, Plaintiffs contacted WACHOVIA in May 2010 to check on the status of their application. Despite Plaintiffs' performance of all the required conditions, WACHOVIA told Plaintiffs that their application for a loan modification had been denied.

23.     Plaintiffs are informed and allege that the conduct of WELLS is similar to that in thousands of other cases throughout the State of California and nationwide.  On December 20, 2010, the California Attorney General announced that WELLS had agreed to provide loan modifications to an estimated 14,900 California homeowners with "pick-a-payment" loans that

PLAINTIFFS' FIRST AMENDED COMPLAINT

were originated by WSB and/or WACHOVIA. (A true and correct copy of the December 20, 2010 news release from the Office of the California Attorney General is attached hereto as **Exhibit 6** and incorporated herein by this reference.) "Recognizing the harm caused by these loans, WELLS FARGO accepted responsibility and entered into this settlement "with the Attorney General. (see **Exhibit 6**) (A true and correct copy of the Assurance Agreement is attached hereto as **Exhibit 7** and incorporated herein by this reference. Although Plaintiffs do not have standing to enforce the Assurance Agreement, their loan fits within all of the requirements set forth in the Assurance Agreement. (See **Exhibit 7**.)

24.     Among other things, the Assurance Agreement incorporates the foreclosure prohibitions found in HAMP Supplemental Directive 10-02, (A true and correct copy of Supplemental Directive 10-02 is attached hereto as **Exhibit 8** and is incorporated as reference as if set forth in full herein.) Per 10-02, WELLS FARGO may not refer to Plaintiffs' foreclosure on conduct a trustee's sale until they have been considered for a HAMP loan modification. Further, WELLS FARGO may not conduct a trustee's sale until at least 30 days after it sends Plaintiffs' a "Non-Approval Letter" (**Exhibit 8**, at page 5.) Here, WELLS FARGO has yet to offer Plaintiffs' a HAMP modification, and thus are in violation of the Assurance and Supplemental Directive 10-02.[1]

25.     For all of these reasons, Plaintiffs maintain that WELLS, WACHOVIA and ETS, the purported foreclosing Trustee, should not be permitted to foreclose on the Subject Property.

### FIRST CAUSE OF ACTION
### Financial Elder Abuse
### Against WACHOVIA, WELLS and DOES 1 - 100

26.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as though fully set forth herein.

27.     In December of 2005, Plaintiffs entered into a contract to refinance the Subject Property using WSB as the lender. At the time that Plaintiffs entered into this contract, Plaintiff,

---

[1] Wachovia did evaluate Plaintiffs' for a MAP (Non-HAMP) modification, which was denied without explanation on May 3, 2010.

1    John H. Giordano was 78 years old and Plaintiff, Georgana G. Giordano was 60 years old.

2        28.    Cal. Welf. & Inst. Code §§ 15675.5 and 1557.6 provides that "an action for

3    damages pursuant for financial elder abuse shall be commenced within four years after plaintiff

4    discovers or, through the exercise of reasonable diligence, should have discovered, the facts

5    constituting the financial abuse." As alleged, in 2009, Plaintiffs began to experience severe

6    financial problems due in part to the increasing interest rate and mortgage payments and began to

7    struggle to make their monthly mortgage payments. It was not until this point in time that

8    Plaintiffs began to suspect that the true terms and conditions of the loan agreement were

9    significantly different than the terms previously represented by WSB, and that the "Pick-A-

10   Payment" loan was inherently deceptive..

11       29.    To utilize the Elder Abuse Act's remedies, a plaintiff must prove "that the

12   defendant has been guilty of recklessness, fraud, oppression or malice in the commission of the

13   abuse." Cal. Welf. & Inst. Code §§ 1567.5(a) and (b). Financial Elder Abuse occurs when a

14   person or entity, "takes, secretes, appropriates, or retains real or personal property of an elder or

15   dependant adult to a wrongful use or with intent to defraud or both, or (2) Assists in taking,

16   secreting, appropriating, or retaining real or personal property of an elder or dependant adults to

17   a wrongful use or with intent to defraud or both." Cal. Welf. & Inst. Code §§ 15610.30(a)(1)-(2).

18       30.    A person or entity is "deemed to have taken, secreted, appropriated, or retained

19   real or personal property for a wrongful use if, among other things, the person or entity takes,

20   secretes, appropriates, or retains possession of real or personal property in bad faith." Cal. Welf.

21   & Inst. Code §§ 15610.30(b). A person is deemed to have acted in bad faith if the person or

22   entity "knew or should have known that the elder…had the right to have the property transferred

23   or made readily available to the elder." Cal. Welf. & Inst. Code §§ 15610.30(b)(1).

24       31.    In this case, WSB made numerous misrepresentations and concealed key facts

25   from Plaintiffs to induce them to enter into the "Pick-A-Payment" contract to refinances the

26   Subject Property. In particular, WSB represented to Plaintiffs that based on their credit score

27   and then current market conditions that they had obtained a loan with very favorable terms.

28   Specifically, WSB told Plaintiffs they had obtained a 30-year fully-amortized ARM with an

initial annual interest rate of 6.710%.  Plaintiffs believed the representations of WSB.  It was

based upon the representations of WSB that Plaintiffs decided to refinance the Subject Property.

Unfortunately, those representations were false.  The true terms are as follows: WSB gave

Plaintiffs a 30-year "pick-a-payment" ARM with a 2-month "teaser" interest rate at 6.710%.

Thereafter the interest rate is adjustable based on the COSI plus 3.500%, with a cap at 11.950%.

(See **Exhibit 2**.)  Plaintiffs' loan included a negative amortization feature and a predatory and

illegal prepayment penalty provision.  (See **Exhibit 2**.)

32.     Plaintiffs believed that they had obtained a 30-year fully-amortized ARM with an

initial annual interest rate at 6.710%.  These are the terms Plaintiffs agreed to and believed were

embodied in the loan agreement, as represented by WSB.  Plaintiffs were unaware that the loan

included a negative amortization feature and an illegal and predatory prepayment penalty.

Plaintiffs were also unaware that the 6.710% disclosed interest rate would adjust before

Plaintiffs' made their first payment; this disclosed interest rate was never actually applied to

Plaintiffs' loan. (See **Exhibit 2**.)  The disclosure of an initial interest rate at 6.710% was

misleading at best and fraudulent at worst.

33.     Under California law, when preparing a loan for a borrower of "modest means

and limited experience in financial affairs," the person preparing the loan has "duties of oral

disclosure and counseling which requires the oral disclosure of the true rate of interest, the

penalty for late payments or other material terms of the loan." (*Zimmer v. Nawabi* (2008) 566

F.Supp.2d 1032; citing *Wyatt v. Union Mortgage Co*. (1979) 24 Cal.3d 773, 782.) In this case,

the true features of the loan were not explained to Plaintiffs, who relied on WSB – their agent –

to explain the voluminous packet of loan documents.  Plaintiffs allege and believe that due to

their advanced age and apparent naivety as to real estate and borrower qualifications, WSB

recognized Plaintiffs' weaknesses and preyed upon the opportunity to benefit from Plaintiffs' age

and lack of knowledge.

34.     As a direct and proximate result of WSB's fraudulent conduct described herein,

Plaintiffs have suffered damage to their consumer credit history and creditworthiness with

resulting financial loss, have paid excessive interest and have suffered additional damages

according to proof.  Additionally, WSB committed such fraud with malice and oppression, and

Plaintiffs are therefore entitled to an award of punitive damages.

35.    WSB's conduct was recklessness, oppressive, fraudulent and malicious and

Plaintiffs are entitled to recover punitive damages pursuant to Welfare & Institutions Code

section 15657.5 and Civil Code § 3294.  In addition to all other remedies provided by law,

Plaintiffs are entitled to recover reasonable attorney fees and costs for financial abuse pursuant to

Welfare & Institutions Code section 15657.5.

**SECOND CAUSE OF ACTION**
**Unfair Business Practices (Violation of Bus. & Prof. Code §17200, et seq.)**
**Against WACHOVIA, WELLS and DOES 1 - 100**

36.    Plaintiffs re-allege and incorporate by reference the allegations contained in the

paragraphs above as though fully set forth herein.

37.    Plaintiffs allege that the course of conduct and actions of WELLS and

WACHOVIA constitutes unfair business practices within the meaning of California Business

and Professions Code §17200, et seq.

38.    Unfair business practices are not limited to competitive conduct.  It is given the

"broadest possible definition" (*Consumers Union of U.S., Inc. v. Fisher Development, Inc.*

(1989) 208 CA3d 1433, 1438.)  and prohibits "a wide range of conduct, such as unlawful, unfair,

or fraudulent business acts or practices.  (*McKell v Washington Mutual, Inc.* (2006) 142 CA4th

1457; *Sisemore v Master Fin., Inc.* (2007) 151 CA4th 1386.)  It includes "the making of false or

misleading statements intended to induce any person to dispose of real or personal property,

perform services or enter into any other related obligation." (*Fletcher v Security Pac. Nat'l Bank*

(1979) 23 C3d 442.)

39.    A private party who "has suffered injury in fact and has lost money or property as

a result of such unfair competition has standing to sue for injunctive relief."  Bus. & Prof. Code

§17204.  Plaintiffs have suffered injuries including, but limited to, paying WSB unearned

kickbacks and "junk" fees in excess of $11,000.  WSB wrongfully collected these fees as a result

of their representations about the true terms and conditions of Plaintiffs' loan agreement.

40.    "Plaintiff does not plead damages or the elements of tort action; Plaintiff only

- 9 -
PLAINTIFFS' FIRST AMENDED COMPLAINT

needs to show that public is likely to be deceived." (*Prata v Superior Court* (2001) 91 CA4th 1128.) Plaintiffs allege that the unlawful acts and practices present a continuing threat to members of the public to be misled and/or deceived by WELLS and WACHOVIA.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants follows:

1.  For punitive damages pursuant to Welfare & Institutions Code § 15657.5;

2.  For reasonable attorney fees pursuant to Welfare & Institutions Code § 15657.5;

3.  For an award of reasonable costs of suit;

4.  For compensatory damages according to proof; and

5.  For any other relief the Court may deem just and proper.

Dated:  January 3, 2011                    Respectfully Submitted

                                          <S> Stephen C. Ruehmann, Esq.
                                          Stephen C. Ruehmann, Esq.
                                          Attorney for Plaintiffs

PLAINTIFFS' FIRST AMENDED COMPLAINT

EXHIBIT 1

**RECORDING REQUESTED BY:**
Chicago Title Company
Escrow #98402192-JL CUP
**AND WHEN RECORDED MAIL TO**
WORLD SAVINGS BANK
FINAL DOCUMENTATION CLOSING DEPT.
P.O.BOX 659548
SAN ANTONIO, TX 78265-9548

Escrow No.: 05-98402192-JL
Locate No.: CACTI7743-7743-2984-0098402192
Title No.: 05-98402192-LD

DOCUMENT:  18733048

| | Pages: 18 |
|---|---|
| Fees | 60 00 |
| Taxes .. | |
| Copies.. | |
| AMT PAID | 60 00 |

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Chicago Title

RDE # 001
12/20/2005
8:00 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

439-47-037

DEED OF TRUST

**THIS PAGE ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION**
(Additional recording fee applies)

(recoverch)(10-04)

RECORDING REQUESTED BY:
WORLD SAVINGS BANK

WHEN RECORDED MAIL TO:
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER: 0041576729

NOTE AMOUNT: $688,000.00

FOR RECORDER'S USE ONLY

## DEED OF TRUST

THIS IS A FIRST DEED OF TRUST WHICH SECURES A NOTE WHICH CONTAINS
PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND
AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES
AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE
RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR MONTHLY
PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS DEED OF TRUST IS
$860,000.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

I.      DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST
    (A)  Security Instrument. This Deed of Trust, which is dated December 12, 2005, will be called the
"Security Instrument."

                                    JB       GEORGANA
    (B)  Borrower.  JOHN N. GIORDANO AND GAYLE GIORDANO, HUSBAND AND WIFE
sometimes will be called "Borrower" and sometimes simply "I" or "me."

    (C)  Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES, will be
called "Lender." Lender is a FEDERAL SAVINGS BANK, which is organized and exists under the laws of
the United States. Lender's address is 1901 Harrison Street, Oakland, CA 94612 .

SD001A (2004-03-2)            DEED OF TRUST-ADJUSTABLE            CA
DEFERRED INTEREST                   Page 1

```
   0  0  3
```
LENDER'S USE ONLY

EXHIBIT A to RJN iso MTD
Page No. 6

0041576729

(D) Note. The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. **$688,000.00**, plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay this debt in regularly scheduled periodic payments as provided in the Note and to pay the debt in full by **January 15, 2036** ("Maturity Date").

(E) Property. The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

(F) Sums Secured. The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

(G) Person. Any person, organization, governmental authority or other party will be called "Person."

(H) Trustor, Beneficiary, Trustee. Borrower is the "Trustor," Lender is the "Beneficiary" and Golden West Savings Association Service Co., A California Corporation is the "Trustee."

II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY

I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with a power of sale subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender and Trustee those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who are beneficiaries of a deed of trust and to trustees of a deed of trust. I am giving Lender and Trustee these rights to protect Lender from possible losses that might result if I fail to:

(i)    pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)    keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

III.    DESCRIPTION OF THE PROPERTY

I give Trustee rights in the Property described below:

(i)    The Property which is located at **1136 SPECIALE WAY, SAN JOSE, CA 95125-4249**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)    All buildings and other improvements that are located on the Described Property;

EXHIBIT A to RJN iso MTD
Page No. 7

0041576729

(iii)    All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)    All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)    All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)    All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)    All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.    BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (i) I lawfully own the Property; (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and the Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows:

### 1.    BORROWER'S PROMISE TO PAY

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

### 2.    PAYMENTS FOR TAXES AND INSURANCE

(A)    Borrower's Obligations

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

SD001C (2004-03-2)                         DEED OF TRUST-ADJUSTABLE                         CA.
                                                 Page 3

0041576729

**(B)     Escrow Accounts**

          Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law.

          The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

          If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

          Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 28, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

EXHIBIT A to RJN Iso MTD
Page No. 9

0041576729

### 3. APPLICATION OF BORROWER'S PAYMENTS

Unless applicable law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;

Second, to pay any advances due to Lender under this Security Instrument;

Third, to pay the amounts due to Lender under Paragraph 2 above;

Fourth, to pay interest due under the Secured Notes;

Fifth, to pay deferred interest due under the Secured Notes;

Sixth, to pay principal due under the Secured Notes;

Last, to pay late charges due under the Secured Notes.

### 4. BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a lien. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

### 5. BORROWER'S OBLIGATION TO MAINTAIN INSURANCE

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

SD001E (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                      Page 5

0041576729

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper Insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender or the insurance company stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. I will notify Lender immediately of any offer to settle a claim I receive from the insurance company. I will immediately deliver any Proceeds I receive from any insurer or other persons to Lender. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of the outstanding balance of the Sums Secured, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any Proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those Proceeds will not be greater than the total amount of the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6. BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

SD001F (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                              Page 6

0041576729

## 7. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (including but not limited to any manner of legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may include, without limitation, appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5, above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

## 8. LENDER'S RIGHT TO INSPECT THE PROPERTY

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

## 9. AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY

I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender. If I receive any such proceeds, I will immediately deliver them to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the Sums Secured have been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, Sums Secured will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds and settle the claim. Lender may then use the proceeds to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of the outstanding principal of the Secured Notes, that use will not delay the due date or change the amount of any of my regularly scheduled payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

SD001G (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                              Page 7

EXHIBIT A to RJN Iso MTD
Page No. 12

0041576729

10.  CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS

  (A)  Borrower's Obligations
        Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

        Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

  (B)  Lender's Rights
        Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the Sums Secured.

11.  OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS
        Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

        Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

        Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

12.  MAXIMUM LOAN CHARGES
        If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits; and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the outstanding principal balance of the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

SD001H (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                              Page 8

0041576729

### 13. LEGISLATION AFFECTING LENDER'S RIGHTS

If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

### 14. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT

Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at **1136 SPECIALE WAY, SAN JOSE, CA 95125-424.** A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I,(C) above entitled, "Definitions of Words Used in This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

### 15. GOVERNING LAW; SEVERABILITY

This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located. In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

### 16. BORROWER'S COPY

I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

### 17. LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY

If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by

SD001j (2004-03-2)                              DEED OF TRUST-ADJUSTABLE                              CA
                                                        Page 9

0041576729

Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.     INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**

An assignment is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include but are not limited to an action for breach of contract, fraud, concealment of a material fact, or for intentional or negligent acts. I assign these rights, and any and all proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to the Sum Secured and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment. I will notify Lender immediately if I believe I have the right to bring any such legal action against any persons, and will notify Lender immediately if I assert any claim or demand against or commence any legal action against any such person. If I receive any proceeds from any persons besides Lender in connection with any such claim, demand or legal action, I will immediately deliver such proceeds to Lender.

**19.     CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to execute such documentation as Lender deems necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.     LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.     WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.     CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.     MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.     CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)     If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

SD001J (2004-03-2)                          QEEO OF TRUST-ADJUSTABLE                          CA
                                                   Page 10

0041576729

(B)    The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of Incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

(C)    If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a master or blanket policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such master or blanket policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such master or blanket policy to Lender annually.

In the event of a distribution of any hazard insurance proceeds, including without limitation any earthquake or special hazards insurance whether or not such coverage was required by Lender, in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me. If I receive any such proceeds, I will immediately deliver them to Lender or otherwise apply them as set forth above.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

(D)    I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the master or blanket hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

25.    FUTURE ADVANCES
At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

SD001X (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                        Page 11

0041576729

**28.    RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each regularly scheduled payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may exercise the power of sale, take action to have the Property sold under applicable law, and invoke such other remedies as may be permitted under any applicable law.

Lender does not have to give me notice of a Breach of Duty. If Lender does not make a demand for full payment of the Sums Secured upon a Breach of Duty, Lender may make a demand for full payment of the Sums Secured upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender. If the Property is sold, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including but not limited to trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**29.    RECONVEYANCE**

Upon payment of all Sums Secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all Secured Notes to Trustee. Trustee shall reconvey the Property without warranty to Borrower. Lender may charge Borrower a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (including the Trustee) for services rendered and the charging of the fee is permitted, whether expressly or by lack of express prohibition, under applicable law. If the fee charged does not exceed any maximum fee set by applicable law, the fee is conclusively presumed to be reasonable.

**30.    STATEMENT OF OBLIGATION**

Lender may collect a fee of $60.00, or such greater maximum amount as may from time to time be allowed by law, for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

SD001M (2004-03-2)                    DEED OF TRUST-ADJUSTABLE                    CA
                                              Page 13

0041576729

### 31.  ( X )  QUICK QUALIFYING LOAN PROGRAM

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

### 32.  ( X )  OWNER OCCUPANCY

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

### ( X )  VALUE INDICATES THAT THE PARAGRAPH APPLIES.

### THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

EXHIBIT A to RJN Iso MTD
Page No. 18

0041576729

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Security instrument and in any rider(s) signed by me and recorded in proper official records.

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____   (Seal)
JOHN N.  GIORDANO

_____   (Seal)
GEORGANA GIORDANO

ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT

SD001 (2004-03-1)        [AF1 (2004-03-1)]        Page 16        CA
                         [AL1 (2004-03-1)]

EXHIBIT A to RJN iso MTD
Page No. 19

WORLD SAVINGS BANK, FSB

# E X H I B I T "A"
## LEGAL DESCRIPTION

### LOAN NO. 0041576729

ALL THAT CERTAIN REAL PROPERTY SITUATED IN THE COUNTY OF SANTA CLARA STATE
OF CALIFORNIA, DESCRIBED AS FOLLOWS:

All of Lot 333, as shown upon that certain Map entitled, "Tract No. 1834 Lincoln Glenn Subdivision Unit No. 8",
which Map was filed for record In the Office of the Recorder of the County of Santa Clara, State of California,
on April 9, 1957 In Book 81 of Maps, at Pages 2 and 3.

Excepting therefrom the underground water with no right of surface entry from Zisch-Nelson-Hauck Co., A
Partnership, to San Jose Water Works, dated April 29, 1957 and recorded April 30, 1957 In Book 3787 Official
Records, Page 463, Santa Clara County Records.

APN: 439-47-039

TAPE ONLY THE LEGAL DESCRIPTION TO THIS PAGE.

SD001 (2003-03-1)                     Page 16 of 18                              CA

STATE OF CALIFORNIA       )
                          )
COUNTY OF SANTA CLARA

On ___12/14/05___ before me, ___Jenny Leung___
a Notary Public in and for said State, personally appeared _____
*John N. Giordano and Georgena Giordano * _____, personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and
that by his/her/their signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signed_____

> JENNY LEUNG
> COMM. # 1520050
> NOTARY PUBLIC-CALIFORNIA
> SANTA CLARA COUNTY
> COMM. EXP. OCT. 15, 2006

EXHIBIT 2

(Page 1 of 6)

WORLD SAVINGS BANK, FSB

## ADJUSTABLE RATE MORTGAGE NOTE

### PICK-A-PAYMENT LOAN

#### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY MONTHLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY MONTHLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER 0041576729                          DATE December 12, 2005

BORROWER(S)  JOHN N. GIORDANO AND GAYLE GIORDANO, HUSBAND AND WIFE  sometimes called "Borrower" and sometimes simply called "I" or "me "

PROPERTY ADDRESS  1136 SPECIALE WAY, SAN JOSE, CA  95125-4249

### 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S  $688,000.00 , called "Principal," plus interest, to the order of the Lender  The Lender is WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,, ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred

### 2.  INTEREST

(A)  Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid  I will pay interest at the yearly rate of 6.710%  The interest rate I will pay  may change as described in this Section 2  Interest will be charged on the basis of a twelve month year and a thirty day month

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

(B)  Interest Change Dates
The interest rate I will pay may change on the 15th day of February, 2006 and on the same day every month thereafter  Each date on which my interest rate could change is called an "Interest Change Date " The new rate of interest will become effective on each Interest Change Date

(C)  · Interest Rate Limit
My lifetime maximum interest rate limit is 11.950%, called "Lifetime Rate Cap "

SD253A (2004-03-1)          ADJUSTABLE NOTE          CA
                              Page I                        LENDER'S USE ONLY

EXHIBIT B to RJN Iso MTD
Page No. 22

(Page 2 of 6)

D041576729

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E) Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding 3.650 percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new interest rate until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, "carryover" or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F) Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if: (a) the Index is for any reason no longer published, or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of this alternative index.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the **15th** day of each month beginning on **February 15, 2006.** I will make these payments every month until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument. If, on **January 15, 2036,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **1901 HARRISON STREET, OAKLAND, CALIFORNIA 94612** or at a different place if required by notice from the Lender.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U S **$ 2,612.35**. This amount will change as described in Sections 3(C) and 3(D) below. My initial monthly payment amount was selected by me from a range of initial payment amounts approved by Lender and may not be sufficient to pay the entire amount of interest accruing on the unpaid Principal balance.

**(C)  Payment Change Dates**

My monthly payment will change as required by Section 3(D) below beginning on the **15th** day of **February, 2007** and on that day every **12th** month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Payment Changes**

Subject to Sections 3(F) and 3(G), on the Payment Change Date my monthly payment may be changed to an amount sufficient to pay the unpaid principal balance, including any deferred interest as described in Section 3(E) below, by the Maturity Date. However, the amount by which my payment can be increased will not be more than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." The Lender will perform this Payment Change calculation at least 60 but not more than 90 days before the Payment Change Date.

SD2533 (2004-03-1)    [901 (2004-03-1)]          ADJUSTABLE NOTE                              CA
003]                                                  Page 2

(Page 3 of 6)

0041576729

[E]   Deferred Interest; Additions to My Unpaid Principal
From time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal

[F]   Limit on My Unpaid Principal; Increased Monthly Payment
My unpaid principal balance can never exceed 125% of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid principal balance, the Principal Balance Cap limitation would be exceeded on the date that my monthly payment is due, I will instead pay a new monthly payment. Notwithstanding Sections 3(C] and 3[D] above, I will pay a new monthly payment which is equal to an amount that will be sufficient to repay my then unpaid principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments

[G]   Payment Cap Limitation; Exceptions
Beginning with the 10th Payment Change Date and every 5th Payment Change Date thereafter, my monthly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

[H]   Notice of Payment Changes
The Lender will deliver or mail to me a notice of any changes in the amount of my monthly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law

**4.   FAILURE TO MAKE ADJUSTMENTS**
If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so. The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing. I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal. During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.   MAXIMUM LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
[A]   Late Charges for Overdue Payments
If the Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be 5.00% of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

SD25SC (2004-03-1)                    ADJUSTABLE NOTE                    CA
                                          Page 3

EXHIBIT B to RJN iso MTD
Page No. 24

(Page 4  of  6)

0041576729

(B)   Default

I will be in default if (i) I do not pay the full amount of each monthly payment on the date it is due, or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts, or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading

(C)   Notice of Default

If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument

(D)   No Waiver by Lender

Even if, at a time when I am in default, the Lender does not require me to pay immediately in full as described above, the Lender will still have the right to do so if I am in default at a later time

(E)   Payment of Lender's Costs and Expenses

The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law  Those expenses may include, for example, reasonable attorneys' fees and court costs

**7.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **1136 SPECIALE WAY, SAN JOSE, CA  95125-424**, or at a single alternative address if I give the Lender notice of my alternative address  I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement.  I may designate only one mailing address at a time for notification purposes

Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address

**8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed  Any person who takes over these obligations is also obligated to keep all of the promises made in this Note  The Lender may enforce its rights under this Note against each person individually or against all of us together  This means that any one of us may be required to pay all of the amounts owed under this Note

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor  "Presentment" means the right to require the Lender to demand payment of amounts due  "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid

**11.   SECURED NOTE – ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured.  Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission  Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission  However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument

If Lender exercises this option to require immediate payment in full, Lender will give me notice of acceleration  If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me

SD2500 (2004-03-1)                    ADJUSTABLE NOTE                    CA
                                          Page 4

(Page 5 of 6)

0041576729

<u>Exception to Acceleration of Payment of Sums Secured.</u> If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if

    (i)    Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender,

    (ii)   Lender approves the creditworthiness of the transferee in writing,

    (iii)  transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards,

    (iv)  an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender, and

    (v)   the transferee executes an assumption agreement which is satisfactory to Lender

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed  The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes

**12.  GOVERNING LAW; SEVERABILITY**
    This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note

**13.  CLERICAL ERRORS**
    In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

**14.  LOST, STOLEN OR MUTILATED DOCUMENTS**
    If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.

SD1S3E (2004-03-f)              ADJUSTABLE NOTE            CA
                            Page 5

(Page 6 of 6)

0041576729

SIGNATURE PAGE

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
JOHN N. GIORDANO

_____ (Seal)
GETTY GIORDANO
GEORGANA

SD253 (2004-03-1)     [W14 (2004-03-01)]     Page 6 of 6     CA

EXHIBIT B to RJN iso MTD
Page No. 27

# EXHIBIT 3

0394305 1

**RECORDING REQUESTED BY:**

LSI TITLE COMPANY, INC.

**WHEN RECORDED MAIL TO:**
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

| DOCUMENT: 20394305 | | Pages: 2 |
|---|---|---|
| | Fees .. | 15.00 |
| | Taxes . | |
| | Copies | |
| | AMT PAID | 15.00 |

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Recording Service

RDE # 011
8/11/2009
11:46 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No. : WC-224988-C    Loan No.: 0041576729

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE
### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,
and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$21,952.08** as of 8/10/2009, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact,
**Wachovia Mortgage, FSB. f.k.a. World Savings Bank, FSB**
C/O ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600 phone


0394305 2

TS NO.: WC-224988-C          LOAN NO.: 0041576729

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.   Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That **Executive Trustee Services, LLC dba ETS Services, LLC** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated   12/12/2005 , executed by  JOHN N GIORDANO AND GEORGANA GIORDANO HUSBAND AND WIFE, as Trustor, to secure certain obligations in favor of  WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES, A FEDERAL SAVINGS BANK, as beneficiary, recorded 12/20/2005, as Instrument No. 18733048, in Book , Page , of Official Records in the Office of the Recorder of Santa Clara County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of  $688,000.00 ; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 2/15/2009 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5.

Dated: 8/10/2009

ETS Services, LLC, as agent for beneficiary

LSI TITLE COMPANY, INC.as limited agent for
ETS Services, LLC

BY: _Gerri Sheppard_

EXHIBIT 4

RECORDING REQUESTED BY:

LSI TITLE COMPANY, INC.

ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

(818) 260-1600

D9D5X6245

TS NO : WC-224988-C
LOAN NO : 0041576729

DOCUMENT: 20504419

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Recording Service

Pages: 2

Fees . . 15 00
Taxes..
Copies. _____
AMT PAID 15 00

RDE # 001
11/12/2009
10:41 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## SUBSTITUTION OF TRUSTEE

WHEREAS, JOHN N GIORDANO AND GEORGANA GIORDANO, HUSBAND AND WIFE was the original Trustor, GOLDEN WEST SAVINGS ASSOCIATION SERVICE CO., A CALIFORNIA CORPORATION was the original Trustee, and WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES, A FEDERAL SAVINGS BANK was the original Beneficiary under that certain Deed of Trust dated 12/12/2005 and recorded on 12/20/2005 as instrument No. 18733048, in Book , Page of Official Records of Santa Clara County, California; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and instead of said original Trustee, or Successor Trustee, thereunder, in the manner in said Deed of Trust provided.

NOW, THEREFORE, the undersigned desires to substitute Executive Trustee Services, LLC dba ETS Services, LLC, as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Dated :

Wachovia Mortgage, FSB. f.k.a. World Savings Bank, FSB

Keo Vang          Attorney in Fact

State of Minnesota
County of Dakota          } ss.
                          }

On 01/11/09 before me, Shoua Moua          Notary Public, personally appeared          Keo Vang          who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of          CA          that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

SHOUA MOUA
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2012

EXHIBIT F to RJN Iso MTD
Page No. 36

# AFFIDAVIT OF MAILING
## FOR SUBSTITUTION OF TRUSTEE BY CODE

T.S. No. :WC-224988-C
Trustor :JOHN N GIORDANO AND GEORGANA GIORDANO HUSBAND AND WIFE

I, Ileanna Petersen, TRUSTEE SALE OFFICER, declare: That I am an officer, agent or employee of ETS Services, LLC
whose business address is:

2255 North Ontario Street, Suite 400 Burbank, California 91504-3120

I am over the age of eighteen years; On 11/10/2009, by Certified and First Class mail, enclosed in a sealed envelope with postage fully prepaid, I deposited in the United States Mail, a copy of the attached Substitution of Trustee to the trustee of record under the Deed of Trust described in said Substitution, and;

A copy of the attached Substitution has been mailed prior to the recording thereof, in the manner provided in Section 2924(b) of the Civil Code of the State of California to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 10/26/2009

Ileanna Petersen, Trustee Sale Officer

EXHIBIT F to RJN Iso MTD
Page No. 36

-

# EXHIBIT 5

20504420 1

DOCUMENT:   20504420

Pages    3

Fees.              18 00
Taxes.
Copies
AMT PAID          18.00

RECORDING REQUESTED BY
ETS Services, LLC

AND WHEN RECORDED MAIL TO:
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Recording Service

RDE #  001
11/12/2009
10:41 AM

T.S. No. WC-224988-C
Loan No. 0041576729
   090586745

SPACE ABOVE THIS LINE FOR RECORDER'S Use

# NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 12/12/2005. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state, will be held by the duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to satisfy the obligation secured by said Deed of Trust. The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.

TRUSTOR:**JOHN N GIORDANO AND GEORGANA GIORDANO HUSBAND AND WIFE**
Recorded **12/20/2005** as Instrument No. **18733048** in Book , page  of
 Official Records in the office of the Recorder of **Santa Clara** County, California,
Date of Sale:**12/4/2009** at **11:00 AM**
Place of Sale:   **At the North Market Street entrance to the County**
                 **Courthouse, 190 North Market Street, San Jose, California**
Property Address is purported to be:   **1136 SPECIALE WAY**
                                       **SAN JOSE, California 95125**

APN #:  439-47-039

The total amount secured by said instrument as of the time of initial publication of this notice is **$802,612.00**, which includes the total amount of the unpaid balance (including accrued and unpaid interest) and reasonable estimated costs, expenses, and advances at the time of initial publication of this notice.

Pursuant to California Civil Code §2923.54 the undersigned, on behalf of the beneficiary, loan servicer or authorized agent, declares as follows:

[ 1 ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed;
[ 2 ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55.

.0504420 2

T.S. No. WC-224988-C
Loan No. 0041576729

Date: **11/10/2009**

ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
Sale Line: 714-730-2727

Ileanna Petersen, TRUSTEE SALE OFFICER

:0504420 3

## CALIFORNIA DECLARATION

This California Declaration is made pursuant to California Civil Code Section 2923.54 and is to be included with the Notice of Sale.

I, JAIMEE GONZALES _____, of Wachovia Mortgage, FSB ("Mortgage Loan Servicer"), declare under penalty of perjury, under the laws of the State of California, that the following is true and correct.

The Mortgage Loan Servicer has obtained from the Commissioner of Corporation a final or temporary order of exemption pursuant to California Civil code Section 2923.53 that is current and valid on the date the accompanying Notice of Sale is filed.

AND

The timeframe for giving notice of sale specified in subdivision (a) of Civil Code Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55.

7/22/09
Date

Name of Signer

VICE PRESIDENT
Title and/or Position

# EXHIBIT 6

State of California • Department of Justice

# OFFICE OF THE ATTORNEY GENERAL

Edmund G. Brown Jr.

News Release

December 20, 2010
FOR IMMEDIATE RELEASE
Contact: (510) 622-4500

## Brown Reaches Settlement With Wells Fargo Worth More Than $2 Billion to Californians With Risky Adjustable-Rate Mortgages

LOS ANGELES - Attorney General Edmund G. Brown Jr. announced today that Wells Fargo has agreed to provide loan modifications worth more than $2 billion to thousands of California homeowners with "pick-a-pay" loans and to pay an additional $32 million to thousands of borrowers who lost their homes through foreclosure.

None of the loans were made by Wells Fargo. All were originated by World Savings and Wachovia, banks Wells Fargo acquired.

"Customers were offered adjustable-rate loans with payments that mushroomed to amounts that ultimately thousands of borrowers could not afford," Brown said. "Recognizing the harm caused by these loans, Wells Fargo accepted responsibility and entered into this settlement with my office."

The pick-a-pay, or pay option adjustable-rate, mortgage loans allowed borrowers to make payments at various levels. The highest level fully covered the monthly interest and principal due. Another level covered interest only. At the minimum level, payment was insufficient to cover the monthly interest owed, and the unpaid interest was added to the loan balance.

Ultimately, the loans would reset, increasing the monthly payments dramatically.

Faced with unemployment, dramatic declines in home prices, and the sharp escalation of the monthly payments, thousands of borrowers were unable to meet their mortgage payments.

The settlement with Wells Fargo covers loans made by World Savings Bank, a subsidiary of Golden West Financial Corp., and Wachovia Bank. Wachovia purchased World Savings in 2006, and Wells Fargo then acquired Wachovia in 2008.

Under the settlement, Wells Fargo will offer affordable loan modifications to an estimated 14,900 California borrowers with pick-a-pay loans made by World Savings or Wachovia. Many of the modifications will include significant principal forgiveness. The total value of the modifications mandated by the settlement is projected to be more than $2 billion.

Wells Fargo is also required to pay $32 million in restitution to more than 12,000 pick-a-pay borrowers in California who lost their homes through foreclosure, plus approximately $1.8 million in costs to the state. Payments to foreclosed homeowners are expected to average more than $2,650.

Wells Fargo has reached settlements over pick-a-pay loans with attorneys general of several other states, including Arizona, Colorado, Florida, Illinois, Nevada, New Jersey, Texas and Washington.

California borrowers eligible for loan modifications should get a notice from Wells Fargo within the next two

months. Borrowers who suffered foreclosures should be notified during the first six months of 2011. For further information and updates, check the Attorney General's website at ag.ca.gov.

A copy of the settlement is attached.

### ###

EXHIBIT 7

<u>ASSURANCE</u>

This Assurance, by and between the People of the State of California, by and through Edmund G. Brown Jr., Attorney General of the State of California and Wells Fargo Bank, N.A. ("Wells Fargo"), is entered into as of this ___ day of December, 2010 ("Effective Date"). The Parties hereby agree to the following:

**I.    PARTIES**

A.    The People of the State of California, by and through Edmund G. Brown Jr., Attorney General of the State of California.

B.    Golden West Financial Corporation, a Delaware Corporation, and its subsidiaries and affiliates, including but not limited to World Savings Bank, FSB, World Savings and Loan Association, World Mortgage Company, World Savings Bank, FSB, World Savings Bank SSB, World Loan Company and Home Loan Experts (hereinafter referred to as "World Savings Bank").

C.    Wachovia Corporation, and its subsidiaries and affiliates, including but not limited to Golden West Financial Corporation, a North Carolina Corporation, AmNet Mortgage, LLC, American Mortgage Network, LLC, Wachovia Mortgage, FSB, Wachovia Bank, FSB and Wachovia Bank, N.A. (hereinafter referred to as "Wachovia"). Wachovia acquired Golden West Financial Corporation, a Delaware Corporation, and its subsidiaries on October 1, 2006. Wells Fargo & Company, a Delaware Corporation, acquired Wachovia Corporation on December 31, 2008, including Wachovia's subsidiaries, including but not limited to Wachovia Bank, N.A. and Wachovia Bank of Delaware, N.A. As a result of this acquisition, Wells Fargo is the party responsible for providing the relief set forth in this Assurance.

1

II.   **STIPULATION**

A.     World Savings Bank and Wachovia originated payment option mortgages ("Pick-a-Payment mortgage loans").  The Pick-a-Payment mortgage loan permitted borrowers to elect to make a fully amortizing 30- or 15-year interest and principal payment; an "interest-only" payment; or a lesser, minimum payment.  When the minimum payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased.

B.     The Office of the California Attorney General opened an investigation into whether violations of Sections 17200 or 17500 of the California Business and Professions Code were committed by Golden West or Wachovia in the marketing and advertising of Pick-a-Payment mortgage loans.  Wells Fargo never originated or marketed and currently does not originate or market Pick-a-Payment mortgage loans, but acquired Wachovia's portfolio of Pick-a-Payment mortgage loans.

C.     Once it acquired Wachovia's portfolio of Pick-a-Payment mortgage loans, Wells Fargo began efforts to modify certain borrowers' loans.

D.     In light of the Pick-a-Payment mortgage loan features, the dramatic declines in home prices, and rising unemployment, some Pick-a-Payment mortgage loan borrowers are unable to meet their mortgage obligations.

E.     The Office of the Attorney General and Wells Fargo share concerns regarding the ability of troubled Pick-a-Payment mortgage loan borrowers to repay their loans.  This Assurance sets forth a framework through which Wells Fargo will offer distressed Pick-a-Payment mortgage loan borrowers affordable loan modifications that include significant principal forgiveness.  That framework includes a reporting requirement, described below, whereby Wells Fargo will provide the Office of the Attorney General with detailed quarterly reports that provide state-specific and

2

aggregate national data on Wells Fargo's efforts to assist Pick-a-Payment mortgage loan borrowers.

III.    **DEFINITIONS**

      A.    *Usage.* The following rules apply to the construction of this Assurance:

           1.    the singular includes the plural and the plural includes the singular;

           2.    "include" and "including" are not limiting;

           3.    the headings of the Sections and subsections are for convenience and shall not constitute a part of this Assurance, and shall not affect the meaning, construction, or effect of the applicable provisions of this Assurance;

           4.    words such as "hereunder," "hereto," "hereof," and "herein" and other words of like import shall, unless the context clearly indicates to the contrary, refer to the whole of this Assurance and not to any particular Section, subsection, or clause hereof.

      B.    *Defined Terms.* The following bolded terms shall have the following meanings in this Assurance unless otherwise required by the context or definition:

*"Accrued Interest"* means scheduled periodic interest owed in accordance with the applicable mortgage note.

*"Borrower"* means the obligor(s) on a Pick-a-Payment mortgage loan note and the title holder(s) who signed the security investment subjecting certain real estate property as collateral for such note.

**"Commencement Date"** means the later of December 18, 2010, and the Effective Date.

*"Corporate and Default-Related Advances"* means any default- or foreclosure-related fee or cost assessed to a Borrower's account for expenditures such as attorney fees, statutory expenses,

foreclosure fees and costs, fees for property valuations, property inspections, property preservation, and protective advances.

"*Deferred Interest*" means the interest charges added to the Borrower's principal balance as a result of the Borrower making the minimum payment where the minimum payment did not include all of the interest that had accrued on the Eligible Mortgage.

"*Delinquent Borrower*" means a Borrower whose mortgage payment is 60 days or more past due.

**"DTI" or "Debt-to-Income Ratio"** means the ratio of the Borrower's first-lien mortgage Monthly Payment (including monthly amounts for principal, interest, escrow, taxes, hazard insurance and homeowners' association or condominium fees if such homeowners' association or condominium fees are escrowed) to the Borrower's gross monthly income, all determined in accordance with HAMP, as defined in Treasury's Supplemental Directive 9-01: Introduction of the Home Affordable Modification Program, April 6, 2009.

"*Eligible Borrower*" means a Delinquent Borrower with an Eligible Mortgage or a Borrower facing Imminent Default with an Eligible Mortgage.

"*Eligible Mortgage*" means a Pick-a-Payment mortgage loan that is secured by a 1-4 unit residential property that is the Borrower's principal residence.

"*Escrow-related Advances*" refers to advances for items such as property taxes, hazard insurance, homeowner association or condominium fees advanced on behalf of the Borrower by Wells Fargo.

"*Fully Amortizing*" means a Pick-a-Payment mortgage loan in which the Borrower's Monthly Payment fully covers the interest accrued and due that month, as well as paying a portion

4

of the principal balance such that the balance of the loan should be paid in full at the expiration of the term of the loan if all Monthly Payments are made when due.

"*Good standing*" means a Borrower who is not currently and, since the effective date of the Borrower's MAP2R modification agreement, has never been delinquent by the equivalent of three (3) full Monthly Payments at the end of the month in which the last of the three (3) delinquent payments was due. Once lost, Good Standing cannot be restored even if the borrower subsequently cures the default.

"*HAMP*" refers to the Home Affordable Modification Program administered by the United States Department of the Treasury.

"*HAMP Principal Reduction Alternative*" refers to the principal reduction alternative described in Treasury's Supplemental Directive 10-05: Modification of Loans with Principal Reduction Alternative, dated June 3, 2010.

"*Imminent Default*" describes a Borrower who Wells Fargo has determined, in accordance with applicable HAMP guidance, as necessary, that default by the Borrower in making scheduled payments on his or her loan is reasonably foreseeable. In assessing whether a Borrower is facing Imminent Default, Wells Fargo will not consider funds held in a 401K, 457, 401(a), or 503 retirement account, an IRA, SEP IRA, Simple IRA, or Roth IRA. Additionally, the fact that a Borrower is projected to Recast to a fully amortizing payment under the terms of the Pick-a-Payment mortgage loan within the upcoming four contractual Monthly Payments using the current applicable interest rate as determined under the terms of the note, and the resulting increase, if any, to the respective Borrower's DTI, shall be considered as a factor in the determination of Imminent Default.

"*LTV*" means the current ratio of the unpaid principal balance of the Eligible Mortgage less any amounts of principal forbearance, to the Market Value of the residential property that secures such Eligible Mortgage as of the time reviewed for eligibility for modification.

"*MAP 1*" shall mean Wells Fargo's proprietary modification program in effect from January 1, 2009 to June 4, 2010.

"*MAP2R*" means Wells Fargo's Mortgage Assistance Program 2 which is based on the terms described in this Assurance.

"*Market Rate*" is the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate for 30-year fixed rate conforming loans, rounded to the nearest 0.125 percent, as of the date that the modification or option is prepared, plus 100 basis points.

"*Market Value*" means the value of the residential property that secures a Pick-a-Payment mortgage loan as determined by Wells Fargo in reliance on an appraisal report prepared not more than 180 days before the date of determination, broker price opinion prepared not more than 120 days before the date of determination or automated valuation model prepared not more than 90 days before the date of determination. Notwithstanding the foregoing, for the purposes of Section "X" of this Assurance, Wells Fargo may rely on the most recent value available in its system of record for determining the value of the residential property.

"*Monthly Payment*" means the amount that is due from a Borrower on a monthly basis according to the note, and shall include any principal amounts, monthly accrued interest, monthly amounts to apply to escrow for taxes, hazard insurance, and homeowners' association or condominium fees.

"*Negative Amortization*" has the same meaning as Deferred Interest.

*"NPV Test"* means the calculation and comparison of the net present value ("NPV") of a modification versus the NPV of conducting no modification as to the same mortgage loan. The calculation of NPV is arrived at using a proprietary formula developed by Wells Fargo. If the NPV of the modification would be greater than the NPV if there was no modification, the result is deemed "positive." If the NPV of the modification would be less than the NPV if there was no modification, the result is deemed "negative."

*"Office of the Attorney General"* means the Office of the Attorney General of California.

*"Payment Reset"* means an annual increase in the rate of interest such that the aggregate scheduled payments of principal (if applicable) and interest in any year increases by up to 7.5%.

*"Pick-a-Payment mortgage loan"* means a mortgage loan originated or acquired by World Savings Bank or Wachovia. The Pick-a-Payment mortgage loan permitted the Borrower to select and make a minimum payment amount for a limited time and subject to certain conditions. In particular, for each payment, the borrower could choose from four options. Borrowers could (i) make a fully amortized interest and principal payment such that the loan would be satisfied in the traditional 30-year term; (ii) make a 15-year fully amortized payment; (iii) make an "interest-only" payment; or (iv) make a lesser, minimum payment. Borrowers could also choose any payment amount between these numbers. When a payment was insufficient to pay the interest owed, unpaid interest was added to the loan balance and the outstanding loan balance increased. Wells Fargo (which did not originate any Pick-a-Payment mortgage loans) acquired Wachovia and its Pick-a-Payment mortgage loan portfolio on December 31, 2008.

*"Reason for Rejection"* means the specific reason a Borrower was not offered a loan modification. Those specific reasons shall include, at a minimum, the following: negative NPV, Borrower already below 31% DTI, Borrower failed to make trial payments, Borrower rejected

7

modification proposal, Borrower failed to provide necessary documents or failed to respond to communications, or other.

"*Recast*" means a recalculation establishing a new fully amortizing periodic payment triggered by the unpaid principal balances cap, or date certain, such that the payment increase as a result of such Recast exceeds 7.5%.

"*Termination date*" means June 30, 2013, with the exception of certain reporting obligations outlined in Section "X. E." of this Assurance.

## IV. WELLS FARGO'S RESPONSIBILITY UNDER THIS ASSURANCE

A. *Responsibility of Wells Fargo.* Wells Fargo is responsible to the Office of the Attorney General for performance of all of the undertakings in this Assurance. Sale or other disposition of the ownership or servicing rights of all or any part of its Pick-a-Payment mortgage loan portfolio or of the entity or entities responsible for servicing or modifying these mortgages shall not relieve Wells Fargo of its duties under this Assurance or constitute a defense to its non-performance.

B. *Remedies for Failure of Wells Fargo to Cause Performance.* This Assurance shall be binding upon Wells Fargo. In the event that the Office of the Attorney General believes that there has been a material breach of the terms and conditions of this Assurance, it, may seek enforcement of this Assurance, or, in the alternative, terminate this Assurance, provided that the Office of the Attorney General notifies Wells Fargo in writing in advance of termination or the filing any enforcement action and gives Wells Fargo at least sixty (60) days to cure the claimed breach. In the event that the Office of the Attorney General terminates this Assurance as a result of a breach by Wells Fargo that has not been cured in accordance with this Paragraph, it shall no longer be bound by the Releases in Section XI. However, (i) nothing in this Assurance shall be

8

construed as authorizing any person or entity other than the Office of the Attorney General to enforce or seek remedies under this Assurance or as a result of this Assurance or a breach thereof; (ii) the remedies in any enforcement action shall not include any criminal sanctions; and (iii) this Assurance and all negotiations, statements, and proceedings in connection therewith shall not be construed as or deemed to be evidence of an admission or concession on the part of Wells Fargo of any violation of law, liability, or wrongdoing by it, and shall not be offered or received in evidence in any action or proceeding, or used in any way as an admission, concession or evidence of any violation of law, liability or wrongdoing of any nature on the part of Wells Fargo.

## V.   LOAN MODIFICATIONS FOR ELIGIBLE BORROWERS IN PICK-A-PAYMENT MORTGAGE LOANS

Starting with the Commencement Date, Wells Fargo, on an ongoing basis, shall offer Eligible Borrowers affordable loan modifications in accordance with the following provisions:

A.   *Loan Modifications to Be Considered.*  Consistent with federal requirements, each Eligible Borrower shall first be considered for a HAMP modification. Eligible Borrowers who do not qualify for or elect not to accept a HAMP modification shall be considered for a MAP2R modification on the terms as outlined in Section "V. B." of this Assurance.

B.   *MAP2R Modification.*  Eligible borrowers who do not qualify for or elect a HAMP modification shall be considered for a MAP2R modification on the terms in this Section "V.B." The following process shall commence upon receipt of the documents described in Section V.B.4. and subsequent verification that the Eligible Borrower's DTI is above 31%. The loan will be converted to a fully amortizing loan and the negative amortization feature will be eliminated.

1.   *Waterfall.*  Wells Fargo will apply the following waterfall, in the order listed below, until an Eligible Borrower's Monthly Payment reaches a DTI of 31%. The DTI may be slightly higher than 31% if the next step or action within the waterfall will result in a

9

DTI below 31%. Once a DTI as close as possible to 31% is reached, Wells Fargo will not apply any additional steps in the waterfall, nor actions within a step. If any step in the waterfall is already achieved, Wells Fargo will proceed to the subsequent step. If all steps of the waterfall have been exhausted and a DTI of 31% can not be achieved, Wells Fargo is not required to offer a MAP2R modification. Following application of the waterfall all loans must pass the NPV test (as outlined in Section V.B.3) before a MAP2R modification must be offered.

    **a.** Waive all Accrued Interest, outstanding late charges, and outstanding fees.

    **b.** Escrow-related Advances, and Corporate and Default-Related Advances will first be capitalized, then immediately and permanently forgiven. If this forgiveness combined with the waiver of all Accrued Interest, outstanding late charges, and outstanding fees in Section "V.B.1.a." does not equal a number that represents ten (10) percent of the unpaid principal balance (calculated by multiplying the pre-modification unpaid principal balance by 10%), then any Deferred Interest, if it exists will be waived until the total of the waived Accrued Interest, Escrow-related Advances, outstanding late charges, outstanding Corporate and Default-Related Advances, and Deferred Interest result in number that represents ten (10) percent of the unpaid principal balance. In the absence of Deferred Interest, only Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, and Corporate and Default-Related Advances will be forgiven. While Accrued Interest, outstanding late charges, outstanding fees, Escrow-related Advances, Corporate and Default-Related Advances will be waived for Eligible Borrowers, regardless of LTV,

forgiveness of Deferred Interest will be applied only to the extent that it does not reduce the Borrower's current LTV below 100%.

c.      Forgive principal until an LTV of 150% is achieved;

d.      Extend the loan term and re-amortize the loan in one month increments to a maximum term of 480 months;

e.      Forbear principal with the opportunity to be forgiven, as outlined in Section "V.B.2", until a LTV of 125% is achieved. The principal forbearance amount is non-interest bearing and non-amortizing. The amount of principal forbearance that is not forgiven will result in a balloon payment fully due and payable upon the earliest of the transfer of ownership of the property, payoff of the interest bearing unpaid principal balance, or maturity of the loan. Should Wells Fargo choose to participate in HAMP Principal Reduction Alternative ("PRA"), Supplemental Directive 10-05, the LTV level of this step shall be adjusted from 125% to 115% for modifications done on a prospective basis from the date Wells Fargo elects to participate in the PRA directive.

f.      Reduce the interest rate in .125% increments. In all cases, the interest rate shall not be reduced below a floor of 2%. If the interest rate after the modification is below the Market Rate, this reduced rate will be in effect for the first three years following the date of the loan modification. Thereafter it will be increased by a maximum of one percent per year at each 12-month anniversary date of the original modification until it reaches the Market Rate, at which time that rate shall be fixed for the remaining loan term. If the interest rate after the modification is above or equal to the Market Rate, then that resulting rate shall become the permanent rate for

11

the remaining loan term.  In no event will a step rate increase result in a greater than 15% increase in the portion of the monthly payment for principal and interest.  If it does, then the rate shall only be increased by the amount that results in an interest rate such that the increase in the monthly principal and interest portion of the payment is no greater than 15%; thereafter, the rate will continue to increase according to the terms above each year until the Market Rate is ultimately reached.

g.      Forbear principal without the opportunity for conditional forgiveness until a LTV of 100% is reached.

2.  *Conditional Forgiveness.*  Principal forborne under Section "V.B.1.e." will be forgiven if the Eligible Borrower who received a MAP2R modification is in Good Standing on the first, second, and third anniversaries of the loan modification.  On each of the above anniversary dates that such Borrower is in Good Standing, equal portions of one-third of the principal forbearance amount will be permanently forgiven.

3.  *NPV test.*  All potential MAP2R modifications will be subjected to an NPV test prior to being offered to a Borrower.  Wells Fargo shall not be required to offer the Borrower a MAP2R modification that yields an NPV negative result.  However, Wells Fargo, in its sole discretion, may offer the NPV negative modification or, if possible, may offer an Eligible Borrower an alternate modification.

4.  *Documentation Requirements.*  In determining the documents required of Eligible Borrowers to apply for MAP2R modification, Wells Fargo, consistent with its need to obtain relevant financial information, will seek to minimize the burden on Eligible Borrowers and maximize participation in MAP2R.  Wells Fargo will not

12

request signed affidavits from Borrowers to document their hardship, and will not require more than one year's income tax return, but will require documentary evidence of the Borrower's current income.

*5. Eligible Borrowers Who Do Not Qualify for MAP2R Modifications.* There is no obligation for Well Fargo to offer MAP2R loan modifications to Eligible Borrowers who cannot be qualified under the HAMP or MAP2R guidelines. Such Eligible Borrowers may receive consideration for payments in connection with short sales, deeds-in-lieu of foreclosure, or relocation assistance as described in Section "VIII."

*6. Following Termination of this Assurance.* After the Termination Date, Wells Fargo will continue to evaluate Eligible Borrowers for potential loan workout solutions that are commercially reasonable and are designed to help avoid foreclosure. These solutions may or may not be MAP2R modifications and their terms will be in the sole discretion of Wells Fargo.

## VI. SERVICING COMMITMENTS FOR BORROWERS SEEKING MAP2R MODIFICATIONS OR FIXED RATE CONVERSIONS

*Outreach to Borrowers.* Within 30 days after the Commencement Date, Wells Fargo will send Delinquent Borrowers with Eligible Mortgages and HUD-certified housing counseling agencies in California two letters describing MAP2R's eligibility requirements, terms, and application process and its relationship with HAMP. These letters will be designed to maximize response rates and will include in-language communications to Spanish-speaking borrowers.

*Borrowers Within 120 Days of Recast.* Any Borrower whose loan is within 120 days of Recast during the term of this Assurance will be offered by Wells Fargo the option, if qualified, of converting their Pick-a-Payment mortgage loan to a fixed rate loan at the Market Rate to be

13

amortized over a thirty (30) year term ("Fixed Rate Conversion"). All such Borrowers eligible for this Fixed Rate Conversion must provide sufficient documentation to allow Wells Fargo to determine the Borrower's ability to repay the converted loan. There shall be no fee for exercising this Fixed Rate Conversion.

      A.    *Servicing Commitments.* In order to ensure that Borrowers receive timely and appropriate consideration for modifications or Fixed Rate Conversion options, Wells Fargo will:

      1.    Maintain a dedicated, adequately staffed help line to serve Eligible Borrowers, including Spanish-speaking borrowers;

      2.    Make and communicate to Eligible Borrowers in writing, decisions on their MAP2R modifications within 30 calendar days of receiving all required documentation from the Eligible Borrower. This notice may be included within any notice required in connection with the consideration of the Eligible Borrower for a HAMP modification;

      3.    Wells Fargo will assign a primary point of contact at Wells Fargo to each Eligible Borrower seeking a modification;

      4.    Establish a formal second-look and escalation protocol for all Eligible Mortgages covered by the Assurance; and

      5.    *Second Liens.* Where an Eligible Borrower who has a first lien loan that is modified under this Assurance, also has an equity line of credit second mortgage loan that was originated by Wachovia or World Savings Bank, and is currently serviced by Wells Fargo's Pick-a-Payment mortgage loan servicing group in San Antonio, Texas, Wells Fargo will review this second lien for an appropriate modification based on the Eligible Borrower's circumstances.

14

B.    *Restrictions on the Foreclosure Process.*  Wells Fargo will apply HAMP rules under Supplemental Directive 10-02, dated March 24, 2010, and any applicable state laws regarding initiating or advancing foreclosures to Eligible Borrowers being considered for MAP2R modifications. In addition, Wells Fargo will ensure that each Eligible Borrower:

1.    Has notes in his or her electronic records accessible to all loss mitigation, modification, and foreclosure departments that indicate whether he or she is being considered for a loan modification;

2.    Who is being considered for a loan modification receives in any foreclosure related communication notice that he or she is still being considered for a modification, with the exception of notices generated by outside counsel or foreclosure trustee companies retained by Wells Fargo to assist with or conduct the foreclosure process.   Wells Fargo will develop and implement policies and procedures to provide notification to their foreclosure attorney/trustee regarding a Borrower's modification status;

3.    Is notified in writing within ten (10) days of submitting a modification request of any documents believed to be missing and necessary for evaluation for a MAP2R loan modification; and

4.    Who is denied a MAP2R modification receives a timely denial letter that clearly explains the reasons that the modification was denied and describes the steps necessary to request that Wells Fargo re-review the decision.

## VII. MISCELLANEOUS PROVISIONS RELATED TO LOAN MODIFICATIONS AND REFINANCING

A. *Modification Fees and Prepayment Penalties.* Wells Fargo will waive all prepayment penalties and assess no fees in connection with a modification of an Eligible Mortgage. Wells Fargo shall not require a customer to make any payment of arrearages as part of the loan modification process.

B. *Releases.* Wells Fargo will not solicit or require releases of claims in connection with loan modifications offered under this Assurance.

C. *Bankruptcy.* MAP2R will be offered to Eligible Borrowers who are in bankruptcy to the extent and in the manner permitted by law.

D. *Borrowers With Prior Modifications.* Eligible Borrowers who have earlier received a MAP 1 modification or other modification not pursuant to this Assurance will not be eligible to be considered for new loan modification offer under this Assurance.

E. *Compliance Monitor.* Wells Fargo will designate an employee as the Compliance Officer responsible for this Assurance. The Compliance Officer will be responsible for providing agreed upon reporting and ensuring that Wells Fargo reviews and responds to complaints from the Office of the Attorney General or from individual borrowers concerning aspects of this Assurance. Within 30 days of receipt of a written consumer complaint sent through the Office of the Attorney General, the Compliance Officer will reply in writing to the Office of the Attorney General with a response that fairly addresses the substance of the consumer's complaint, including a discussion of any corrective measures that may have been taken to address issues raised by the complaint.

F. *Borrower Consent.* A Borrower's complaint to the Office of the Attorney General suffices as (or constitutes) the Borrower's authorization for Wells Fargo to discuss his or her

complaint with the Office of the Attorney General.

## VIII.   NON-RETENTION ALTERNATIVES TO FORECLOSURE

      A.    Wells Fargo will offer the Home Affordable Foreclosure Alternatives ("HAFA") or its internal short sale or deed-in-lieu of foreclosure alternatives to Eligible Borrowers who are unable to qualify for an affordable modification or who decide to leave their homes, and otherwise are qualified for a short-sale or deed-in-lieu of foreclosure under HAFA guidelines.

      B.    Eligible Borrowers who qualify for HAFA will receive an incentive payment of at least $3,000 for a short-sale or deed-in-lieu of foreclosure; and

      C.    Eligible Borrowers who do not qualify for HAFA, but otherwise qualify for a short-sale or deed-in-lieu of foreclosure will receive payments of at least $1,500 to assist with relocation expenses.

## IX.   FORECLOSURE RELIEF PROGRAM

      Wells Fargo will provide $33,868,615 to the Office of the Attorney General. $32,000,000 of this sum shall be distributed to borrowers who experienced a foreclosure sale on a property secured by an Eligible Mortgage between January 1, 2005 and the Effective Date. The Office of the Attorney General may hire a third party settlement administrator to distribute payments to eligible foreclosed borrowers. The remaining $1,868,615 shall be paid to the Office of the Attorney General, for the exclusive use of the Office of the Attorney General for the investigation and prosecution of consumer protection matters, for consumer education and outreach, and to pay any costs incurred to distribute payments to eligible foreclosed borrowers.

## X.   REPORTING REQUIREMENTS

      Wells Fargo will provide the Office of the Attorney General with quarterly reports through the Termination Date, setting forth the information outlined in this Section "X", except for the

requirements set forth as described in Section "X.E." All such reports will be provided within forty-five (45) days after the end of each quarter and provide both state, as determined by the property address, and aggregate national data, as necessary per the specific reporting requirement for the activity during that quarter. The quarterly reports will provide the following information broken down by the type of relief for Eligible Mortgages: (1) HAMP modifications, (2) MAP2R modifications, and (3) combined information for both HAMP and MAP2R modifications; (4) Foreclosure Alternatives; and (5) Fixed Rate Conversions.

Additionally, in the event that the Office of the Attorney General, in connection with implementation of this Assurance, wishes to locate and contact Borrowers of Eligible Mortgages who between January 2, 2005, and the Commencement Date have gone through a foreclosure sale, Wells Fargo will work with the Office of the Attorney General to contact or provide contact information for those Borrowers. Specifically, Wells Fargo will 1) provide the name and most current mailing address of all Borrowers of foreclosed Eligible Mortgages within 60 days of a such a request, and 2) at its own expense, and upon request of the Office of the Attorney General, submit the names and all necessary identifying information of Eligible Borrowers that were not located using the information provided in section 1) to the United States Postal Services' National Change of Address (NCOA) service, and/or to a settlement administrator or other qualified vendor, and will provide the Office of the Attorney General with a best new address for said Eligible Borrowers within 90 days of such a request.

    A.    *Modification Eligibility and Requests.*

        1.    Number of Borrowers and Eligible Borrowers;

        2.    Number of Borrowers contacting Wells Fargo on the borrower's initiative by delinquency status; and

18

3. Number of modifications, foreclosure alternatives, and fixed rate conversions that are: (i) offered (ii) completed and (iii) rejected. For modification, foreclosure alternative, and fixed rate conversion requests that were rejected, provide the number of Eligible Borrowers rejected by Reason For Rejection.

B. **_Loan Modifications._**   For loans modified under this Assurance provide the following:

1. Average and total dollar amounts of Accrued Interest, Escrow-related Advances, Corporate and Default-Related Advances and outstanding late charges forgiven and average percentage of unpaid principal balance this represents;

2. Average and total dollar amounts of Deferred Interest forgiven and average percent of unpaid principal balance this represents;

3. Number of loans that received principal forgiveness, total principal forgiveness and average principal forgiveness per loan;

4. Number of loans that received principal forbearance, total principal forbearance and average principal forbearance per loan;

5. Number of loans that receive term extensions and the average new total term of such loans;

6. Number of loans that receive interest rate reductions, average initial post-modification interest rate, and average interest rate reduction of such loans;

7. Average percentage Monthly Payment reduction;

8. Average and total dollar value of the modification by comparing the concessions of the modification to the original terms of the Note, assuming

19

the Borrower takes advantage of all opportunities presented by the modification;

9.   Average LTV pre- and post-modification;

10.  Number of short-sales that are (i) offered (ii) completed and (iii) rejected; total and average incentive payment to Eligible Borrower pursuant to Section "VIII";

11.  Number of deeds-in-lieu of foreclosure that are (i) offered (ii) completed and (iii) rejected; total and average incentive payment to Borrowers pursuant to Section "VIII";

12.  Number of deeds-in-lieu of foreclosure and short sale requests that are (i) offered (ii) completed and (iii) rejected;

13.  Number of foreclosure sales completed; and

14.  Number of Borrowers who receive a Fixed Rate Conversion pursuant to Section "VI."; number of Borrowers who applied but were rejected for such conversions; delinquency rates of converted loans.

C.   *Portfolio and Modification Performance*

1.   Delinquency rates of unmodified Eligible Mortgages, by number and percentage, that are current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process;

2.   Delinquency rates (current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process) for Eligible Mortgages modified under MAP2R by the following post modification LTV categories: Less than 80%, 80% to 100%, 101% to 125%, 126% to 150%, and more than 150%.

Break out this data for loans that received principal forgiveness and those that did not:

3.    Number of Eligible Mortgages that have not been modified and the percentage of the Pick-a-Payment mortgage loan portfolio they represent as determined by a total Pick-a-Payment portfolio on the last day of the month in which this Assurance is signed;

4.    Number and percentage of Borrowers electing the minimum payment option based upon the last payment received from the Borrower during the quarter for which the report is being prepared;

5.    Number and percentage of Borrowers accruing Deferred Interest based upon the last payment received from the Borrower during the quarter for which the report is being prepared;

6.    Number of Eligible Mortgages expected to Recast within the next four contractual Monthly Payments;

7.    Number of Eligible Borrowers (and unpaid principal balance) with unmodified loan and a current LTV of 100% or more; and

8.    Number of 60 or more days delinquent Eligible Borrowers (and unpaid principal balance) with unmodified loans and a current LTV of 150% or more.

D.    *Servicing Performance*

1.    Average time from when Eligible Borrower submits all documentation required in the documentation requirements of Section "V.B.4" until a modification decision is mailed; and

2.    Number of Eligible Borrowers who have submitted all documentation required in the documentation requirements of Section "V.B.4" for whom the time to notification was more than 30 days and more than 60 days.

E.    *Additional Reporting.*  Beginning July 1, 2013 Wells Fargo will provide the Office of the Attorney General with quarterly reports through December 31, 2017 that include the information set forth below.  Such reports will be provided within forty-five (45) days after the end of each quarter.

1.    Delinquency rates of unmodified Eligible Mortgages by number and percentage that are 60 or more days delinquent;

2.    Delinquency rates (current, 30-59 days delinquent, 60 or more days delinquent, and in the foreclosure process) for Eligible Mortgages modified under MAP2R during the term of this Assurance;

3.    For any Eligible Mortgage Wells Fargo chooses to modify at its own discretion under its then existing Modification Program from January 1, 2013 through December 31, 2017, Wells Fargo will report the following information related to such modifications:

a.    The number of modifications of Eligible Mortgages that are: (i) offered (ii) completed and (iii) rejected;

b.    Number of Eligible Mortgages that received principal forgiveness, total principal forgiveness and average principal forgiveness per loan; and

c.    The average percentage of monthly payment reduction per Eligible Mortgage.

4.     The amount of forbearance that has been converted to permanent forgiveness under Section "V.B.2" on Eligible Mortgages modified under MAP2R prior to June 20, 2013.

## XI.     RELEASES: MORE FAVORABLE SETTLEMENT

A.     *Release.*  The Office of the Attorney General hereby fully releases and discharges Wells Fargo, its parents, affiliates, subsidiaries, employees, officers and directors from any and all civil and administrative actions, claims and causes of action based upon or with respect to the origination, marketing, servicing, prior modification or resolution practices of Eligible Mortgages prior to the date of this Assurance which the Office of the Attorney General could have brought against Wells Fargo prior to the Effective Date, except for (i) any regulatory or enforcement proceedings by or on behalf of an Agency other than a State Attorney General; (ii) any claims that the State of California might have as an investor in securities; and (iii) any criminal investigations or proceedings. This release does not apply to any matters currently in litigation with the Office of the Attorney General unrelated to the subject matter of this Assurance.

B.     *More Favorable Terms.*  In the event that Wells Fargo voluntarily enters into an agreement to assist troubled Eligible Borrowers with the Attorney General of any state that is not a signatory to this same Assurance in a form or on terms that are different than those contained in this Assurance, then Wells Fargo will provide a copy of such agreement to the Office of the Attorney General for review. If, after review, the Office of the Attorney General determines those alternative terms or form of agreement are, taken as a whole, more favorable than those contained in this Assurance, then the parties will amend this Assurance to reflect any such terms or form of agreement in place of terms hereof.

23

## XII. OTHER TERMS AND CONDITIONS

**A.** *No Admission.* The Assurance shall not constitute an admission of wrongdoing by Wells Fargo or its predecessors, nor shall it be cited as such by the Office of the Attorney General. The Assurance shall not be admissible in any other proceeding.

**B.** *Submission to Jurisdiction for Limited Purpose.* Wells Fargo submits to the jurisdiction of the court in the State of California for the limited purpose of entering into and enforcing this Assurance only. Any acts, conduct or appearance by Wells Fargo does not constitute and shall not be construed as a submission to the general jurisdiction of any court in the State of California for any purpose whatsoever.

**C.** *Voluntary Agreement.* This Assurance is entered into voluntarily and no promises, other than what is contained in this Assurance, or threats have been made by the Office of the Attorney General or any member thereof to induce Wells Fargo to enter into this Assurance.

**D.** *Jurisdiction; Choice of Law; Venue.* The Assurance shall be construed and enforced in accordance with the laws of the State of California. In any action or dispute relating to this Assurance, the jurisdiction and venue shall be in the Superior Court of the State of California. Wells Fargo submits to the jurisdiction of the Superior Court of the State of California for the limited purposes stated in this paragraph, which should not be construed as a submission to the general jurisdiction of that Court.

**E.** *Confidentiality.* The Office of the Attorney General agrees that all confidential information disclosed to it by Wells Fargo, its parent, subsidiaries or any of its affiliates, including but not limited to the periodic reports that will be provided pursuant to Section X shall be considered records of an investigation conducted by the Office of the Attorney General.; provided, however, that the following information reported to the Office of the Attorney General on a periodic

24

basis shall not be deemed confidential to the extent aggregated for Eligible Borrowers in the State of California for a full reporting period:

> 1.    the total number of Eligible Mortgages modified;
>
> 2.    the total amount of forgiven and forborne principal; and
>
> 3.    the total amount of interest and principal expected to be saved by Eligible Borrowers as a result of such MAP2R modifications over the life of the Eligible Mortgages.

The Office of the Attorney General shall not disclose or use any confidential information without the prior written consent of the disclosing party, except to the extent required by law, regulation or court order (and in any of these circumstances, only upon prior written notice to Wells Fargo).

F.    **Enforcement.**  This Court shall retain jurisdiction over this matter for the purpose of (a) enabling the Office of the Attorney General to apply, at any time, for enforcement of any provision of this Assurance; (b) enabling any party to this Assurance to apply, upon giving thirty (30) days written notice to all other parties, for such further orders and directions as might be necessary or appropriate either for the construction or carrying out of this Assurance; and (c) enabling any party to this Assurance to request information from a party or third party, with notice to counsel for the parties and subject to the parties' and any third parties' right to object and to move to quash.

F.    *Conflict with Subsequent Law.*  In the event that any applicable law conflicts with any provision hereof, making it impossible for Wells Fargo to comply both with the law and with the provisions of this Assurance, the provisions of the law shall govern.

G.    *No Third Party Beneficiaries Intended.*  This Assurance is not intended to confer upon any person any rights or remedies, including rights as a third party beneficiary.  This

25

Assurance is not intended to create a private right of action on the part of any person or entity other than the parties hereto.

      **H.**    *Service of Notices.*  Service of notices required or permitted by this Assurance or its enforcement shall be in writing and delivered on the following persons, or any person subsequently designated by the parties:

**For Wells Fargo:**

---

David L. Moskowitz
Deputy General Counsel
1 Home Campus, X2401-06T
Des Moines, Iowa 50328-0001


**For the Office of the Attorney General:**

---

Benjamin G. Diehl
Deputy Attorney General

Office of the Attorney General
300 S. Spring St., Ste. 1702
Los Angeles, CA 90013
Phone: (213) 897-5548
Fax: (213) 897-4951

Any party may change the designated person and address for delivery with respect to itself by giving notice to the other parties as specified herein.

      **I.**    *Waiver.*  The failure of any party to exercise any rights under this Assurance shall not be deemed a waiver of any right.

      **J.**    *Severability.*  If any part hereof shall for any reason be found or held invalid or unenforceable by any court of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder hereof, which shall survive and be construed as if such invalid or unenforceable part had not been contained herein.

26

**K.** *Counterparts.* This Assurance may be signed in one or more counterparts, each of which shall be deemed an original. Facsimile or electronic copies of this Assurance and the signatures hereto may be used with the same force and effect as an original.

**L.** *Inurement.* This Assurance is binding and inures to the benefit of the parties hereto and their respective predecessors, successors and assigns.

**M.** *Integration.* This Assurance constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter thereof.

**N.** *Amendment.* This Assurance may be amended solely by written agreement signed by the Office of the Attorney General and Wells Fargo.

**O.** *Termination.* The obligations of Wells Fargo under this Assurance shall terminate on the Termination Date. Termination of the obligations under this Assurance shall not change or terminate the terms of any loan modification entered into pursuant to Section "V.B" of this Assurance.

**P.** *Attorneys Fees and Costs.* No attorney's fees and costs related to this Assurance shall be sought by the Office of the Attorney General."

*[Signature pages on the following page]*

27

DATED this _11th_ day of _December_, 2010

WELLS FARGO BANK, N.A.

_Michael J. Heid_ (signature)

Michael J. Heid
Executive Vice President

APPROVED AS TO FORM AND CONTENT:

Benjamin G. Diehl
Deputy Attorney General

For:   EDMUND G. BROWN JR.        Attorney General of California

By: _____

28

EXHIBIT 8



**Help for America's Homeowners** — MAKING HOME AFFORDABLE

**_Supplemental Directive 10-02_**        **_March 24, 2010_**

## _Home Affordable Modification Program – Borrower Outreach and Communication_

### Background

In Supplemental Directive 09-01, the Treasury Department (Treasury) announced the eligibility, underwriting and servicing requirements for the Home Affordable Modification Program (HAMP). Under HAMP, servicers apply a uniform loan modification process to provide eligible borrowers with sustainable monthly payments for their first lien mortgage loans. This Supplemental Directive represents an ongoing effort to improve program effectiveness by amending policies and procedures related to borrower outreach and communication, especially with respect to the initiation and continuation of foreclosure actions and extending HAMP benefits to borrowers who have filed for bankruptcy court protection. These changes become effective on June 1, 2010. The changes set forth herein do not abridge a servicer's ability to service delinquent loans in accordance with industry standards.

The significant changes described in this Supplemental Directive include:

- Clarification of the requirement to solicit proactively all borrowers whose first mortgage loans are potentially eligible for HAMP and who have two or more payments due and unpaid. Reasonable solicitation efforts are defined.

- Prohibition against referral to foreclosure until either: (i) a borrower has been evaluated and determined to be ineligible for HAMP; or (ii) reasonable solicitation efforts have failed.

- A requirement that a servicer, in certain specific circumstances, allow a 30-day borrower response period following issuance of a Non-Approval Notice before a foreclosure sale may be conducted.

- A requirement that a servicer provide a written certification to the foreclosure attorney or trustee stating that a borrower is not HAMP-eligible before a foreclosure sale may be conducted.

- A requirement that servicers must consider borrowers in active bankruptcy for HAMP if a request is received from the borrower, borrower's counsel or bankruptcy trustee.

- Clarification of the requirement that servicers use reasonable efforts to obtain approval from investors to participate in HAMP.

This Supplemental Directive provides guidance to servicers of first lien mortgage loans that are not owned or guaranteed by Fannie Mae or Freddie Mac (Non-GSE Mortgages). Servicers of first lien mortgage loans that are owned or guaranteed by Fannie Mae or Freddie Mac should refer to the related HAMP guidelines issued by the applicable GSE.

## Borrower Communication

### Borrower Solicitation
Each servicer must have clear and comprehensive internal written policies for identification and solicitation of borrowers who are potentially eligible for HAMP based on information in the servicer's possession. These procedures should follow investor guidelines and comply with all contractual restrictions and with applicable laws, rules and regulations, including, but not limited to, the Fair Debt Collection Practices Act.

Servicers must pre-screen all first lien mortgage loans where two or more payments are due and unpaid to determine if they meet the basic criteria for consideration under HAMP (one-to-four unit residential property, occupied by the borrower as his or her principal residence, not vacant or condemned, originated on or before January 1, 2009, unpaid principal balance does not exceed $729,750[1] and not previously modified under HAMP). Servicers must proactively solicit for HAMP any borrower whose loan passes this pre-screen, unless the servicer has documented that the investor is not willing to participate in HAMP pursuant to the "Investor Solicitation" section of this Supplemental Directive.

Solicitation must include written communication clearly describing HAMP. Use of the form of solicitation letter available on www.HMPadmin.com shall satisfy this requirement. The servicer's HAMP solicitation may also identify other options potentially available to help the borrower cure the delinquency and retain homeownership. A servicer is deemed to have made a "Reasonable Effort" to solicit a borrower if over a period of at least 30 calendar days: (1) the servicer makes a minimum of four telephone calls to the last known phone numbers of record, at different times of the day; and (2) the servicer sends two written notices to the last address of record by sending one letter via certified/express mail or via overnight delivery service (such as Federal Express or UPS) with return receipt/delivery confirmation and one letter via regular mail. Any contact with eligible borrowers, whether by telephone, mail or otherwise, must (1) advise borrowers that they may be eligible for HAMP; (2) clearly describe the Initial Package required to be submitted by the borrower pursuant to Supplemental Directive 10-01 and state what other information the servicer needs to complete the HAMP analysis; (3) provide a toll-free telephone number through which the borrower can reach a servicer representative; and (4) identify any unique requirements the servicer may have established for submission of an Initial Package received later than 30 business days prior to a scheduled foreclosure sale date. All contact attempts must be documented in the servicing file. If the servicer has documentation evidencing that it satisfied the Reasonable Effort standard for HAMP prior to the effective date of this Supplemental Directive, re-solicitation of the borrower is not required.

---

[1] Maximum loan limit for one unit dwelling. 2 units - $934,200; 3 units - $1,129,250; 4 units - $1,404,400.

Successful efforts by a servicer to communicate with the borrower or co-borrower about resolution of the delinquency are termed "right party contact" for purposes of this Supplemental Directive. If right party contact is established and the borrower expresses an interest in HAMP, the servicer must send a written communication to the borrower via regular or electronic mail that clearly describes the Initial Package required to be submitted by the borrower to request a HAMP modification. The communication should:

- Describe the income evidence required to be evaluated for HAMP;

- Provide the Request for Modification and Affidavit (RMA) (or other proprietary financial information form substantially similar in content to the RMA and, if necessary, a Hardship Affidavit); and

- Include an Internal Revenue Service (IRS) Form 4506T-EZ (or IRS Form 4506-T, if necessary).

The communication should also include clear language stating that during the HAMP evaluation the home will not: (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated. In the communication, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the communication. Electronic mail for this purpose may only be sent to an email address provided by the borrower when right party contact was made. Such email address must be documented in the servicing file.

If right party contact is established prior to satisfaction of the Reasonable Effort standard, the servicer must continue to take steps to satisfy the Reasonable Effort standard until the Initial Package is submitted by the borrower.

If right party contact is established but the borrower does not submit an Initial Package, the servicer must resend the Initial Package communication. Again, the servicer must include a specific date by which the Initial Package must be returned, which must be no less than 15 calendar days from the date of the second communication. If the borrower does not respond by providing an Initial Package within the required time period set forth in the second communication, the servicer may determine the borrower to be ineligible for HAMP.

If right party contact is established but the borrower submits an incomplete Initial Package within the required time period, the servicer must comply with the Incomplete Information Notice requirements set forth in Supplemental Directive 10-01. If the borrower does not respond to either the 30-day Incomplete Information Notice or the 15-day Incomplete Information Notice by providing a complete Initial Package within the required time period, the servicer may determine the borrower to be ineligible for HAMP.

The servicer is not required to send an Initial Package if, as a result of discussions with the borrower, the servicer determines that the borrower does not meet the basic eligibility criteria for HAMP as described in Supplemental Directive 09-01, or the servicer determines that the borrower's monthly mortgage obligation (including principal interest, taxes, insurance and

homeowner's association fee, if applicable) is substantially less than 31% of the borrower's gross monthly income. Such decision must be documented in the applicable servicing file.

**Other Borrower Communication**

As set forth in Supplemental Directives 09-07 and 10-01, servicers must acknowledge the Initial Package within 10 business days of receipt through a written communication to the borrower that includes a description of the servicer's evaluation process and timeline. Additionally, the communication must include clear language that states that during the HAMP evaluation the home will not: (i) be referred to foreclosure; or (ii) be sold at a foreclosure sale if the foreclosure process has already been initiated. If the Initial Package is received from the borrower via email, the servicer may email the acknowledgement to the same email address from which the Initial Package was received or other email address designated by the borrower in the Initial Package.

Servicer communications should provide the borrower with clear written information designed to help the borrower understand the modification process in accordance with Supplemental Directive 09-01. These communications must provide a toll-free telephone number where the borrower can reach a representative of the servicer capable of providing specific details about the HAMP modification process. The hours of operation for the toll-free telephone number should be listed.

Servicers must have adequate staffing, written procedures, resources and facilities for receipt, management, retention and retrieval of borrower documents to ensure that borrowers are not required to submit multiple copies of documents. Servicers must accept the RMA and other required verification documents submitted on behalf of borrowers by HUD-approved housing counseling agencies, non-profit consumer advocacy organizations, legal guardians, powers of attorney or legal counsel when the borrower has provided written authorization or provides written authorization contemporaneously with the submission of the RMA. The borrower is considered to have provided written authorization if a copy of the power of attorney, order of guardianship, or other legal papers authorizing the third party to act on behalf of the borrower are provided. Written authorization may be supplanted by the legal documents authorizing a third party to act more generally on behalf of the borrower in cases of disability or borrowers unavailable due to active duty military service.

Servicers must have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and complaints in connection with HAMP within the timelines specified in this and previous Supplemental Directives. These procedures must include a process through which borrowers may escalate disagreements to a supervisory level, where a separate review of the borrower's eligibility or qualification can be performed.

## Foreclosure Actions

The following guidance replaces in its entirety the guidance set forth on page 14 of Supplemental Directive 09-01 under the heading "Temporary Suspension of Foreclosure Proceedings".

**Prohibition on Referral and Sale**

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale _unless_ and _until_ at least one of the following circumstances exists:

- The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

- The borrower is offered a trial period plan, but fails to make a trial period payment by the last day of the month in which such payment is due; or

- The servicer has established right party contact, has sent at least two written requests asking the borrower to supply required information in accordance with this Supplemental Directive and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or

- The servicer has satisfied the Reasonable Effort solicitation standard without establishing right party contact; or

- The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in their servicing system.

**Borrower Response Period**

Supplemental Directive 09-08 describes circumstances in which a written Non-Approval Notice must be provided to borrowers who have not been approved for HAMP. The servicer may not conduct a foreclosure sale within the 30 calendar days after the date of a Non-Approval Notice or any longer period required to review supplemental material provided by the borrower in response to a Non-Approval Notice unless the reason for non-approval is (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower/request withdrawn or (4) the loan was previously modified under HAMP.

A model clause describing these rights is attached as Exhibit A. Use of the model clause is optional; however, it illustrates the level of specificity that is deemed to be in compliance with the language requirements of this Supplemental Directive.

**Halt of Existing Foreclosure Actions During a Trial Period Based on Verified Income**

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer shall, immediately upon the borrower's acceptance of a trial period plan based on verified income as described in Supplemental Directive 10-01 and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

The servicer shall not be in violation of this instruction to the extent that: (a) a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt some or all activities or events in the matter after the servicer has made reasonable efforts to

move the court or request the public official for a cessation of the activity or event; (b) the servicer must take some action to protect the interests of the owner, investor, guarantor or servicer of the loan in response to action taken by the borrower or other parties in the foreclosure process; or (c) there is not sufficient time following the borrower's acceptance of the trial period plan for the servicer to halt the activity or event, provided that in no event shall the servicer permit a sale to go forward. The servicer must document in the servicing file if any of the foregoing exceptions to the requirement to halt an existing foreclosure action are applicable.

**Deadline for Suspension of Foreclosure Sales**
When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (the "Deadline"), the servicer must suspend the sale as necessary to evaluate the borrower for HAMP. Servicers are not required to suspend a foreclosure sale when: (1) a request for HAMP consideration is received after the Deadline; (2) a borrower received a HAMP modification and lost good standing; (3) a borrower received a HAMP offer and made the first payment under the trial period plan, but did not make a subsequent payment by the applicable deadline; or (4) a borrower was evaluated based upon an Initial Package and determined to be ineligible under HAMP requirements.

The servicer shall not be in violation of this instruction to the extent that a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt the sale after the servicer has made reasonable efforts to move the court or request the public official for a cessation of the sale. The servicer must document in the servicing file if the foregoing exception to the requirement to suspend an existing foreclosure sale is applicable.

A borrower will be deemed to have requested consideration for HAMP when a complete Initial Package (i.e., RMA, Form 4506T-EZ, required evidence of income) is received by the servicer or its foreclosure attorney/trustee prior to the Deadline. However, the servicer may establish additional requirements for requests received later than 30 calendar days prior to a scheduled foreclosure sale date, including, for example, a requirement that a complete Initial Package be delivered through certified/express delivery mail with return receipt/delivery confirmation to either the servicer or the foreclosure attorney/foreclosure trustee. These requirements must be posted on the servicer's website and communicated to the borrower in writing in accordance with the Borrower Solicitation requirements of this Supplemental Directive or through other written communication.

If the borrower contacts the servicer prior to the Deadline, the servicer must inform the borrower of the Deadline and any submission requirements.

**Mitigating Foreclosure Impact**
The servicer must take the following action to mitigate foreclosure impact:

- **Simultaneous Trial Period Plan and Foreclosure Explanation.** When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a trial period plan, the servicer must provide the borrower with a written notification that

explains, in clear language, the concurrent modification and foreclosure processes and that states that even though certain foreclosure activities may continue, the home will not be sold at a foreclosure sale while the borrower is being considered for HAMP or while the borrower is making payments under a trial period plan. Model language for this notification is attached as Exhibit B. Use of the model language is optional; however, it illustrates the level of specificity that is deemed to be in compliance with the language requirements of this Supplemental Directive.

- **Foreclosure Attorney/Trustee Communication.** Servicers must develop and implement written policies and procedures to provide notification to their foreclosure attorney/trustee regarding a borrower's HAMP status, including whether the borrower is potentially eligible for HAMP (and is subject to the Borrower Solicitation requirements of this Supplemental Directive), and whether the borrower is being evaluated for, or is currently in, a HAMP trial period plan. Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of this Supplemental Directive with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales.

- **Certification Prior to Foreclosure Sale.** Servicers must develop and implement written procedures applicable to all loans that are potentially eligible for HAMP (and are subject to the Borrower Solicitation requirements of this Supplemental Directive) that require the servicer to provide to the foreclosure attorney/trustee a written certification that (i) one of the five circumstances under the "Prohibition on Referral and Sale" section of this Supplemental Directive exists, and (ii) all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached. This certification must be provided no sooner than seven business days prior to the scheduled foreclosure sale date (the Deadline) or any extension thereof.

## Borrowers in Bankruptcy

Borrowers in active Chapter 7 or Chapter 13 bankruptcy cases must be considered for HAMP if the borrower,[2] borrower's counsel or bankruptcy trustee submits a request to the servicer. With the borrower's permission, a bankruptcy trustee may contact the servicer to request a HAMP modification. Servicers are not required to solicit these borrowers proactively for HAMP. Borrowers who are in a trial period plan and subsequently file for bankruptcy may not be denied a HAMP modification on the basis of the bankruptcy filing. The servicer and its counsel must work with the borrower or borrower's counsel to obtain any court and/or trustee approvals required in accordance with local court rules and procedures. Servicers should extend the trial period plan as necessary to accommodate delays in obtaining court approvals or receiving a full remittance of the borrower's trial period payments when they are made to a trustee, but they are not required to extend the trial period beyond two months, resulting in a total five-month trial

---

[2] Where the borrower filed the bankruptcy pro se, (without an attorney), it is recommended that the servicer provide information relating to the availability of a HAMP modification to the borrower with a copy to the bankruptcy trustee. This communication should not imply that it is in any way an attempt to collect a debt. Servicers must consult their legal counsel for appropriate language.

period. In the event of a trial period extension, the borrower shall make a trial period payment for each month of the trial period, including any extension month.

When a borrower in an active Chapter 13 bankruptcy is in a trial period plan and the borrower has made post-petition payments on the first lien mortgage in the amount required by the trial period plan, a servicer must not object to confirmation of a borrower's Chapter 13 plan, move for relief from the automatic bankruptcy stay, or move for dismissal of the Chapter 13 case on the basis that the borrower paid only the amounts due under the trial period plan, as opposed to the non-modified mortgage payments.

Borrowers who have received a Chapter 7 bankruptcy discharge in a case involving the first lien mortgage who did not reaffirm the mortgage debt under applicable law are eligible for HAMP. The following language must be inserted in Section 1 of the Home Affordable Modification Agreement:

> "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement."

**Substitution of Income Documents**
When a borrower is in an active Chapter 7 or Chapter 13 bankruptcy, the servicer may accept copies of the bankruptcy schedules and tax returns (if returns are required to be filed) in lieu of the RMA and Form 4506T-EZ, and may use this information to determine borrower eligibility (with the income documentation). Servicers should request the schedules and tax returns from the borrower, borrower's counsel or bankruptcy court. If the bankruptcy schedules are greater than 90 days old as of the date that such schedules are received by the servicer, the borrower must provide updated evidence of income to determine HAMP eligibility. Additionally, either directly or through counsel, borrowers must provide a completed and executed Hardship Affidavit (or RMA).

**Waiver of Trial Period Plan**
Pending development of systems capability, and at the discretion of the servicer, borrowers in an active Chapter 13 bankruptcy who are determined to be eligible for HAMP may be converted to a permanent modification without completing a trial period plan if:

- The borrower makes all post-petition payments on their first lien mortgage loan due prior to the effective date of the Home Affordable Modification Agreement, and at least three of those payments are equal to or greater than the proposed modified payment;

- The modification is approved by the bankruptcy court, if required; and

- The trial period plan waiver is permitted by the applicable investor guidelines.

When payments under a bankruptcy plan are used in lieu of a trial period in accordance with these guidelines, the servicer and borrower will be eligible to accrue "pay for success" and "pay for performance" incentives for the length of a standard HAMP trial period.

Changes to several data reporting attributes under HAMP will be required to enable servicers to report a bankruptcy plan in lieu of a HAMP trial period.   Servicers should look for a full description and detail of the data attributes for bankruptcy reporting to be posted on www.HMPadmin.com.  Servicers may not exercise this waiver authority until the data elements are posted and the system capability exists to support this policy change.

## Continued HAMP Eligibility

Servicers are reminded of those situations when a borrower may seek reconsideration for a HAMP modification.  As stated in Supplemental Directive 10-01, a borrower who has been evaluated for HAMP but does not meet the minimum eligibility criteria described in the "HAMP Eligibility" section of Supplemental Directive 09-01 or who meets the minimum eligibility criteria but is not qualified for HAMP by virtue of a negative NPV result, excessive forbearance or other financial reason, may request reconsideration for HAMP at any time prior to the Deadline if they experience a change in circumstance.   In these cases, the servicer is obligated to consider the borrower's request pursuant to its obligations under the Servicer Participation Agreement (SPA).

A servicer's SPA obligation to offer the borrower a HAMP modification is considered satisfied, and the borrower is not eligible for a subsequent HAMP offer, if the borrower either (1) received a HAMP modification and lost good standing, or (2) the borrower received a HAMP offer and either failed to make one or more payments under trial period plan by the last day of the month in which it was due, or if applicable, failed to provide all required documents by the end of the trial period.

## Servicing Transfers of Loans in Foreclosure

The servicer may transfer a loan free and clear of all HAMP-related obligations under the SPA if one of the five circumstances under the "Prohibition on Referral and Sale" section of this Supplemental Directive exists with respect to such loan, and any applicable response period has elapsed, unless a borrower with continued HAMP eligibility requests consideration prior to the effective date of the servicing transfer.  Such loans are not required to be transferred pursuant to the form of Assignment and Assumption Agreement attached as Exhibit D to the Servicer Participation Agreement.   Servicers should refer to the "Transfers of Servicing" section of Supplemental Directive 09-01 for guidance regarding servicing transfers of loans modified pursuant to HAMP.

## Investor Solicitation

Within 90 days of executing a Servicer Participation Agreement (SPA), the servicer must review all servicing agreements to determine investor participation in the program.  Within 30 days of identifying an investor as a non-participant, the servicer will contact the investor in writing at least once, encouraging the investor to permit modifications under HAMP.

Within 60 calendar days following the effective date of this Supplemental Directive, participating servicers must, if they have not already done so, provide to Fannie Mae, as Treasury's Program Administrator: (1) the number of investors for whom it services loans; (2) a list of those investors who do not participate in HAMP; and (3) the number of loans serviced for each investor that does not participate in HAMP. Servicers that execute a SPA after the date of this Supplemental Directive must provide the investor participation list to Fannie Mae, as Treasury's program administrator, within 120 days of SPA execution.

Servicers are required to notify Fannie Mae, as Treasury's Program Administrator, of changes to the Investor Participation List within 30 calendar days of any change.

## Documentation

Servicers are required to maintain appropriate documentary evidence of their HAMP-related activities, and to provide that documentary evidence upon request to Freddie Mac as the Compliance Agent for Treasury. As Compliance Agent, Freddie Mac will incorporate the additional requirements articulated in this Supplemental Directive into its compliance program. Servicers must maintain documentation in well-documented servicer system notes or in loan files for all HAMP activities addressed in this Supplemental Directive, including, but not limited to, the following:

- All HAMP related communications, whether verbal or written, with or to the borrower or trusted advisor (including but not limited to the dates of communications, names of contact person(s), and a summary of the conversation), including any email correspondence to or from the borrower.

- Pre-screening of loans for HAMP prior to referring any loan to foreclosure or conducting scheduled foreclosure sales.

- Postponement of scheduled foreclosure sales in applicable scenarios.

- Substitution of income documents for borrowers in active Chapter 7 or Chapter 13 bankruptcy.

- Waiver of the trial period plan for borrowers in active Chapter 13 bankruptcy.

- Policies and procedures required by this Supplemental Directive.

- Certification prior to foreclosure sale.

- Evidence of assessment of investor willingness to participate in HAMP and any specific outreach to investors on either a portfolio or loan-by-loan basis, including copies of any contracts with investors relied upon in denying HAMP modifications. This should include, where applicable, documentation relating to specific parameters or limitations on participation required by investors for steps in the waterfall.

- Evidence of receipt of the Initial Package from a borrower.

**EXHIBIT A**
**BORROWER RESPONSE PERIOD**

The model clause in this exhibit provides sample language that may be used to explain the borrower response period that exists after a borrower is issued a Non-Approval Notice unless the reason for non-approval is (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower/request withdrawn or (4) the loan was previously modified under HAMP. Use of the model clause is optional; however, it illustrates a level of specificity that is deemed to be in compliance with language requirements of this Supplemental Directive.

> You have 30 calendar days from the date of this notice to contact [name of servicer] to discuss the reason for non-approval for a HAMP modification or to discuss alternative loss mitigation options that may be available to you. Your loan may be referred to foreclosure during this time, or any pending foreclosure action may continue. However, **no foreclosure sale will be conducted and you will not lose your home** during this 30-day period [or any longer period required for us to review supplemental material you may provide in response to this Notice].

**EXHIBIT B**
**MODEL SIMULTANEOUS TRIAL PLAN-FORECLOSURE PROCESS EXPLANATION**

[Servicer Logo]

[Date]

[Name]
[Address 1]
[Address 2]

Dear [borrower and co-borrower name(s)]:

We are committed to helping you retain your home. That's why we are currently evaluating your mortgage for eligibility in the Home Affordable Modification Program ("HAMP") which would modify the terms of your loan and make your mortgage payments more affordable. Your loan has been previously referred to foreclosure and we will continue the foreclosure process while we evaluate your loan for HAMP. However, **no foreclosure sale will be conducted and you will not lose your home** during the HAMP evaluation.

**HAMP Eligibility**
- If you are eligible for HAMP, you will enter into a "trial period". You will receive a Trial Period Plan Notice which will contain a new trial payment amount (this will temporarily replace your current mortgage payment during the HAMP trial period). To accept the Trial Period Plan, you must make your first trial payment by the specified due date. Once you accept, we will halt the foreclosure process as long as you continue to make your required trial plan payments.

- If you do not qualify for HAMP, or if you fail to comply with the terms of the Trial Period Plan, you will be sent a Non-Approval Notice. In most cases, you will have 30 days to review the reason for non-approval and contact us to discuss any concerns you may have. During this 30-day review period, we may continue with the pending foreclosure action, but **no foreclosure sale will be conducted and you will not lose your home.**

**Important—Do not ignore any foreclosure notices.**
The HAMP evaluation and the process of foreclosure may proceed at the same time. You may receive foreclosure/eviction notices - delivered by mail or in person - or you may see steps being taken to proceed with a foreclosure sale of your home. While you will not lose your home during the HAMP evaluation, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions. If you have any questions about the foreclosure process and the evaluation of your HAMP request, contact us at [XXX.XXX.XXXX]. If you do not understand the legal consequences of the foreclosure, you are also encouraged to contact a lawyer or housing counselor for assistance.

**Questions**
Call **XXX.XXX.XXXX** if you cannot afford to make your trial period payments, but want to remain in your home. Or if you have decided to leave your home, contact us—we have other options that may be able to help you avoid foreclosure. Additionally, if you have any questions about the foreclosure (or other legal notices that you receive), please call us for assistance. You can also call the Homeowner's HOPE™ Hotline at 1-888-995-HOPE (4673) if you need further counseling. They offer free HUD-certified counseling services in English and Spanish, and can help answer any questions you have.

Sincerely,
[Servicer Contact Person Name]
[Servicer Contact Person Title]
[Servicer Name]